**BURLINGTON INDUSTRIES, INC., Plaintiff,**

v.

**Asher B. EDELMAN, Dominion Textile Inc., Samjens Partners I, PaineWebber, Inc., and James J. Ammeen, Defendants.**

Civ. A. No. C–87–274–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

June 5, 1987.

As Corrected July 30, 1987.

Hubert Humphrey, James T. Williams, Jr., and James R. Saintsing, of Brooks Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., and Irvin B. Nathan and Melvin Garbow, of Arnold & Porter, Washington, D.C., for plaintiff.

Daniel W. Fouts and Charles T. Hagan, of Adams Kleemier Hagan Hannah & Fouts, of Greensboro, N.C., and Jay Greenfield, Sidney S. Rosdeitcher, and Martin Klotz, of Paul, Weiss, Rifkind, Wharton & Garrison, of New York City, for defendants Asher B. Edelman, Dominion Textile Inc., and Samjens Partners I.

William K. Davis, of Bell, Davis & Pitt, Winston-Salem, N.C., for defendant James J. Ammeen.

## MEMORANDUM OPINION

GORDON, Senior District Judge:

On April 24, 1987, Samjens Partners I ("Samjens"), a partnership whose partners are a limited partnership comprised of entities controlled by Asher B. Edelman ("Edelman") and a subsidiary of Dominion Textile Inc. ("Dominion"), filed with the Securities and Exchange Commission a Schedule 13D disclosing its ownership of approximately 7.6% of the outstanding common stock of Burlington Industries, Inc. ("Burlington"). On this Schedule 13D, Samjens disclosed its intent to attempt to acquire a controlling interest in the outstanding stock of Burlington. Burlington commenced this action on April 29, 1987, claiming that Samjens violated federal and state laws in connection with its efforts to acquire Burlington. On May 6, 1987, Samjens commenced an Offer to Purchase (and filed Schedule 14D–1) all outstanding shares of Burlington stock. On May 12, 1987, Burlington filed an amended complaint containing claims in opposition to the tender offer.

Burlington's primary claims allege violations of federal securities laws. Burlington alleges that James J. Ammeen ("Ammeen"), a former vice president of Burlington, disclosed confidential inside information to PaineWebber Incorporated ("PaineWebber") and to the members of Samjens in violation of section 10(b) and section 14(e) of the Securities Exchange Act of 1934. Burlington further alleges that the Schedule 13D and Schedule 14D–1 filed by Samjens contain materially false and misleading information in violation of sections 13(d) and section 14(d) of the Williams Act.

Burlington also asserts that Samjens acquisition of Burlington would violate Section 7 of the Clayton Act, which prohibits one corporation from acquiring another corporation where the acquisition might substantially lessen competition or tend to

create a monopoly. Burlington contends that a combination of Burlington and Dominion would substantially lessen competition in the United States denim market.

In addition to these federal causes of action, Burlington asserts several actions under North Carolina law, including breach of contract and fiduciary duty by Ammeen; tortious interference with contract; inducing, aiding, and abetting the alleged breaches of contract and fiduciary duty; and unfair trade practices.

Burlington now moves for a preliminary injunction against Samjens, Edelman, Dominion, and Ammeen. Burlington does not request injunctive relief against PaineWebber. Specifically, Burlington asks the court to enjoin these defendants from, among other things, pursuing the present tender offer or making additional tender offers; acquiring, selling, or voting any shares of Burlington stock; disclosing any confidential inside information concerning Burlington; and "attempting to take any other steps in furtherance of [their] plan to acquire control of Burlington." Burlington also asks the court to require defendants to correct allegedly false statements made in filings with the Securities and Exchange Commission. Finally, Burlington prays that the court order defendants to divest themselves of all Burlington common stock, and, to help ensure this divestiture, Burlington asks that the court empower Burlington to refuse to transfer on its books any shares defendants might attempt to transfer to a third party. Defendants fervently oppose Burlington's motion. In addition, defendants move that the court dismiss Burlington's claims under Section 7 of the Clayton Act for a lack of standing.

In determining whether to grant a preliminary injunction under Federal Rule of Civil Procedure 65, a trial court must evaluate the interplay of four factors: (1) the probable irreparable harm to the moving party if the preliminary injunction is not issued; (2) the probable harm to other parties or persons if the preliminary injunction is issued; (3) the likelihood of the moving party succeeding on the merits of the underlying claim; and (4) the public interest.

An order granting an injunction must specifically set forth, in reasonable detail, the reasons for its issuance. Fed.R.Civ.P. 65(d). The court has evaluated the parties' evidence, and, for the reasons that follow, the court grants in part and denies in part plaintiff's request for a preliminary injunction.

## I. THE ANTITRUST LAW CLAIMS

Section 7 of the Clayton Act, prohibits a person engaged in commerce from acquiring the stock or assets of another person engaged in commerce, "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1973 and Supp.1987). In interpreting this statute, the Supreme Court has ruled "that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United ed States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963). *Accord United States v. General Dynamics Corp.,* 415 U.S. 486, 497, 94 S.Ct. 1186, 1193–94, 39 L.Ed.2d 530 (1974); *Liggett & Myers v. FTC,* 567 F.2d 1273, 1275 (4th Cir.1977).

Plaintiff claims that a merger of Burlington and Swift Textiles Incorporated, a subsidiary of Dominion, would lessen competition in the United States denim industry. The court surmises that this merger would indeed present legally viable antitrust issues. Burlington and Swift are two of the five largest manufacturers of denim in the United States. These five manufacturers, according to the figures before the court, produce approximately 80% of the denim manufactured in this country thereby evidencing that denim is a highly concentrated market. And denim, as a readily recognizable product, may well constitute a distinct

"product market" as defined by Supreme Court decisions. *See* IV E.W. Kintner, *Federal Antitrust Law* 337–413 (1984). A combination of Burlington and Swift would control approximatley one-third of the United States denim market. The courts have frequently invalidated corporate combinations where the resulting increase in concentration is less than the increase taht would attend a Burlington and Swift merger.

Furthermore, the Department of Justice merger guidelines indicate that the Antitrust Division of the Department of Justice may challenge a merger of Burlington and Swift. The "Justice Guidelines" measure market concentration thresholds attending horizontal mergers in terms of the Herfindahl-Hirschmann Index ("HHI"). The HHI evaluates market concentration through a formula that accounts for the relative size and distribution of the firms in a particular market. The HHI measure is simply the sum of the squares of each firm's market share in the relevant market. The HHI increases as the number of firms in the market decreases and as the disparity in size among those firms increases. For example, a market consisting of two firms with market shares of 60% and 40% would have an HHI of 5200 (60 squared + 40 squared). A market consisting of 10 firms with market shares of 10% each would have an HHI of 1000 (10 squared + 10 squared + ...). A market consisting of 100 firms with market shares of 1% each would have an HHI of 100. The Justice Guidelines indicate that a market with an HHI exceeding 1800 is a highly concentrated market and that an acquisition, in such a highly concentrated market, which increases the HHI by more than 50 presents serious antitrust problems.

The figures in this case indicate an unacceptable change in the HHI. According to Swift's estimates, the top five producers of denim in the United States control the following market shares:

| | |
|---|---|
| Cone Mills | 25.2% |
| Burlington | 25.1% |
| Greenwood | 11.0% |
| Riegel | 10.7% |
| Swift | 8.1% |

Source: "Expansion and Modernization Proposal: February 1987" (Koon Dep. Ex. 1 at 1415). The current HHI for this market is:

| | | |
|---|---|---|
| $25.2 \times 25.2$ | = | 635.04 |
| $25.1 \times 25.1$ | = | 630.01 |
| $11.0 \times 11.0$ | = | 121.00 |
| $10.7 \times 10.7$ | = | 114.49 |
| HHI | = | 1,500.54 |

The post-merger HHI would be:

| | | |
|---|---|---|
| $33.2 \times 33.2$ = | 1.102.24 | (25.1% of Burlington added to |
| $25.2 \times 25.2$ = | 635.04 | the 8.1% of Swift) |
| $11.0 \times 11.0$ = | 121.00 | |
| $10.7 \times 10.7$ = | 114.49 | |
| HHI = | 1,972.77 | |

The change in HHI would be 472.23 (1972.-77 less 1500.54), a figure suggesting that the Department of Justice is likely to challenge the merger.

Regardless of the potential antitrust problems that attend an attempted merger, the law requires that a private party, such as Burlington, must have standing to seek an injunction, on antitrust grounds, of the potential merger. "Standing" to sue means simply that the party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Standing is a jurisdictional issue which concerns the power of a federal court to hear and decide a case. Standing does not generally concern the ultimate merits of a lawsuit.

Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The Supreme Court has concluded "that in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.,* — U.S. —, —, 107 S.Ct. 484, 491, 93 L.Ed.2d 427, 438 (1986) (citing *Brunswick Corp. v.*

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). This "injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. If a plaintiff's injuries are not attributable to the possibility of lessened competition, then that plaintiff has not suffered the required "antitrust injury" and is thus not an appropriate party to seek relief under the antitrust laws.

Recent cases and legal commentary that evaluate the "antitrust injury" requirement have concluded that a target of a tender offer may not raise an antitrust challenge to the proposed takeover. The rationale of these cases and commentaries is that, even assuming a lessening of competition, the plaintiff company does not suffer any injury that flows from the lessening of competition. After the completion of a proposed merger, the plaintiff is "a part of the very entity it claims will have a supercompetitive advantage, *i.e.*, it suffers no antitrust harm." *Carter Hawley Hale Stores, Inc. v. The Limited, Inc.*, 587 F.Supp. 246, 250 (C.D.Cal.1984). *See H.H. Robertson Co. v. Guardian Industries Corp.*, 50 Antitrust & Trade Reg.Rep. (BNA) 166 (3d Cir. Jan. 9, 1986), *vacated pending rehearing en banc*, Nos. 85-3232 and 85-3233 (Feb. 12, 1986); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325 (7th Cir.1986); *Central National Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983). *See also* II Areeda & Turner, *Antitrust Law* ¶ 346b (1978) (target corporation's interest "outside the protection" of section 7 of the Clayton Act). Other decisions have essentially assumed that a target company has standing and have proceeded to decide the target's substantive antitrust claims. *See Grumman Corp. v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981); *Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378 (6th Cir.1981); *Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F.Supp. 1513, 1516-17 (S.D.Ind.1986); *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 592 F.Supp. 203, 211 n. 1 (N.D.Tex.1984).

The Fourth Circuit has not addressed this issue. In *Pargas, Inc. v. Empire Gas Corp.*, 423 F.Supp. 199 (D.Md.), *aff'd*, 546 F.2d 25 (4th Cir.1976), the district court preliminarily enjoined a tender offer where the target asserted violations of the securities and antitrust laws, and the Fourth Circuit, in a one paragraph *per curiam* opinion, affirmed the district court's decision. *Pargas* does not address the standing issue. Furthermore, the *Pargas* decision predates the Supreme Court's explication, in *Brunswick* and *Cargill*, of the "antitrust injury" requirement. This court is of the opinion that the Fourth Circuit would now adopt the reasoning of those cases that deny standing to a target corporation.

■ Denial of standing to a target corporation to seek an injunction preventing a hostile takeover makes imminent sense when one views the purposes behind the antitrust laws. "The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as the Robinson-Patman Act, 'Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.'" *Standard Oil Co. v. Federal Trade Comm'n*, 340 U.S. 231, 248-49, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). The type of injuries about which a target such as Burlington complains—potential loss of employees, possible diversion of customers to other businesses, and loss of trade secrets and financial information—are not injuries that occur because of the potential lessening of competition attending the merger. Rather, these injuries occur because of a change in corporate control. The injuries are in no way related to the fact that less competition may exist in the open market.

Finally, the court notes that policy considerations also support denying a target company standing to contest a hostile takeover. As Judge Friendly has noted, targets of tender offers routinely seek shelter under Section 7 of the Clayton Act. Accordingly, a court should not interfere with a tender offer unless the target company dispels the inference of disingenuousness

by showing that the alleged antitrust violation would expose it to readily identifiable harm. *See Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 854 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). In addition, the courts should not allow the antitrust laws to become a weapon to protect particular competitors since, as the courts often state, the antitrust laws were enacted for "the protection of *competition*, not *competitors.*" *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). These observations are particularly compelling in the present case where plaintiff, a competitor of Dominion, has indicated a desire to take control of Dominion. Plaintiff thus seeks to effect the same combination it contends will unlawfully diminish competition thereby reinforcing, instead of dispelling, the inference of plaintiff's disingenuousness.

Accordingly, the court grants defendants' motion to dismiss plaintiff's antitrust claim under Section 7 of the Clayton Act and, obviously, denies plaintiff's motion for a preliminary injunction insofar as that motion requests preliminary relief based on antitrust claims.

■ As another purported basis for preliminary relief, plaintiff argues that defendants' actions may constitute an unreasonable restraint of trade in violation of section 1 of the Sherman Act. Plaintiff's complaint, however, does not contain a count for violation of the Sherman Act. Consequently, a motion for preliminary relief pursuant to the Sherman Act is not properly before this court. If plaintiff desires to assert this claim, plaintiff must first move to amend the complaint and then move for preliminary relief.

## II. THE SECURITIES LAWS CLAIMS

Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(d), provides that a party who acquires beneficial ownership of more than 5% of a class of nonexempt equity securities of an issuer must, within ten days after crossing the 5% threshold, file a statement containing the information re-

quired by Schedule 13D. On April 24, 1987, Samjens and its affiliates filed a Schedule 13D stating that they had acquired approximately 7.6% of Burlington's stock.

Section 14(d) of the Exchange Act, 15 U.S.C. § 78n(d), details the substantive and procedural requirements for tender offers and the dissemination of tender offer materials. Rule 14d–3 requires a "bidder" to disclose, on Schedule 14D–1, information quite similar to the information section 13(d) requires. The partnership defendants filed a Schedule 14D on May 6, 1987.

Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), prohibits fraudulent and deceptive practices in connection with tender offers, and, similarly, section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful to use "in connection with the purchase or sale of any registered security any manipulative or deceptive device or contrivance."

### A. Plaintiff's Standing To Assert Its Securities Laws Claims

■ A target corporation, such as Burlington, has standing to seek equitable relief under sections 13 and 14 of the Exchange Act. *Dan River Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1222 n. 5 (4th Cir. 1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981). *See* T. Hazen, *The Law of Securities Regulation* §§ 11.-18–11.19 (1985). In addition, as a purchaser of its own stock, Burlington may also seek relief under section 10(b). *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (buyers and sellers of securities may sue under section 10(b) and Rule 10b–5). Burlington does not have standing under section 10(b), however, for matters not related to its position as a purchaser or seller of stock (i.e. no standing as a representative of all Burlington shareholders). *See* T. Hazen, *The Law of Securities Regulation* § 13.3 (1985) (citing *Liberty National Insurance Holding Co. v. Charter Co.*, 734 F.2d 545 (11th Cir.1984)).

## B. The Section 10(b) Claim

Section 10(b) of the Exchange Act and SEC Rule 10b–5 proscribes fraud "in connection with the purchase or sale of any security." As is the case in a common law action for fraud, a successful plaintiff must prove the materiality of, and reasonable reliance on, any allegedly fraudulent statements or omissions.

The Supreme Court has suggested that a court may presume a plaintiff's reliance if an alleged omission is material. A defendant may rebut this finding of reliance. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). In the present case, the evidence suggests that Burlington will be unable to prove reasonable reliance, or, at least, that defendants will successfully rebut any presumption of reliance. As a practical matter, it is inconceivable that Burlington would rely, in purchasing or selling its own stock, on any information defendants compiled. Even assuming that Burlington, somehow, could demonstrate reliance, this reliance would be patently unreasonable. Burlington obviously has access to more detailed and current financial information, regarding its own stock, than defendants could ever hope to amass. Accordingly, the court will not grant injunctive relief based on plaintiff's section 10(b) claims. Plaintiff has failed to demonstrate the existence of "serious questions" about the substance of these claims.

## C. The Section 13(d) and Section 14(d) Claims

"Section 13's filing requirements are aimed at creeping acquisitions and open market or privately negotiated large block purchases. In contrast, section 14's Williams Act filing and disclosure provisions are called into play when there is a 'tender offer.'" T. Hazen, *The Law of Securities Regulation* § 11.13 (1985). The filing requirements of sections 13 and 14 seek to alert the marketplace about every large, rapid aggregation or accumulation of securities which might represent a potential shift in corporate control. *See Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979). These sections attempt to protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure. *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963).

The courts have determined that a target corporation has standing to seek an injunction to enforce these provisions. *See Dan River, Inc. v. Unitex Ltd.,* 624 F.2d at 1222–24; *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). The courts reason that the target corporation is the only party capable of promptly and effectively policing the statutory filings. *Milstein,* 453 F.2d at 719–21. But in ruling on a target's injunction motion, it is incumbent on courts to remember that the Williams Act disclosure provisions seek to protect shareholders.

The Schedule 13D filing must fully disclose the identity of the reporting persons; the background of the reporting persons; the name of the issuer and title of the class of securities acquired; the source and amount of funds or other consideration to be used in making additional purchases; the purpose of the acquisition and any plans or proposals that the reporting persons may have relating to significant changes in connection with the issuer; the amount of securities held by each reporting person; and any contracts, arrangements, understandings or relationships with respect to the securities of the issuer. *See* 17 C.F.R. § 240.13d–101.

Section 14(d) requires disclosures of the type specified in Schedule 13D in addition to such other information as the SEC may require. *See* 17 C.F.R. § 240.14d–100. Plaintiff claims that certain disclosures mandated by the regulations are of especial relevance to this litigation. Item 4 requires the bidder to disclose information regarding the financing of the tender offer. 17 C.F.R. § 240.14d–100, Item 4. Item 5 mandates that the bidder disclose the purpose(s) of the tender offer including "any plans or proposals that relate to or would

result in," among other things, "[a] sale or transfer of a material amount of assets of the subject company or any of its subsidiaries." 17 C.F.R. § 240.14d–100, Item 5(b). Finally, Item 10 states that the bidder must disclose material information relating to "[t]he applicability of anti-trust laws." 17 C.F.R. § 240.14d–100, Item 10(c).

In interpreting section 13(d), the *Milstein* court concluded that the "reporting provisions of the Exchange Act are clear and unequivocal, and *they are satisfied only by the filing of complete, accurate, and timely reports." Dan River, Inc. v. Unitex Ltd.*, 624 F.2d at 1223 (citing *Milstein* ). Inasmuch as the section 13 filings and section 14 filings require disclosure of information essentially identical in content and purpose, it is reasonable to assume that section 14 filings require similar completeness and accuracy.

Plaintiff herein claims that defendants have failed to make the complete and accurate filings these statutes and regulations contemplate. Except for the court's findings regarding plaintiff's insider trading claim under section 14(e), the court concludes that defendants' filings, including amendments, appear to satisfy the requirements of section 13(d) and section 14(d). Accordingly, the court does not grant injunctive relief based on these alleged securities laws violations because plaintiff has failed to demonstrate at least "serious questions" concerning the merits of these claims.

### (i) Insider Information And The Role Of Defendants Ammeen and PaineWebber.

Plaintiff argues that defendants failed to disclose the receipt of inside information. Plaintiff further argues that defendants misrepresented Ammeen's and PaineWebber's involvement in the tender offer. Inasmuch as the allegation concerning the receipt and use of inside information essentially mirrors plaintiff's argument under section 14(e), the court will address that argument in the portion of the opinion which discusses section 14(e). And inasmuch as Samjens has attached a copy

of Burlington's complaint and amended complaint as an amendment to its filings, the court determines that Samjens has adequately represented Ammeen's and PaineWebber's involvement in the tender offer.

### (ii) Risk That The Proposed Transaction Would Violate Federal Antitrust Laws.

17 C.F.R. § 240.14d–100, Item 10(c), requires the bidder to furnish information, in the Schedule 14D–1, on "[t]he applicability of anti-trust laws" where this information is "material to a decision by a security holder whether to sell, tender[,] or hold securities being sought in the tender offer." In interpreting this requirement, the courts have concluded that an adequate disclosure entails specification of the "basic facts" relating to the antitrust implications so that outsiders may reach their own investment decisions with knowledge equal to that of the insiders. *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 697 (2d Cir.1973). "Basic facts" include "information about the market position of the two companies relating to their same or similar products, which may produce ... anticompetitive effect[s] once the companies are merged." *Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86, 100 (E.D.N.Y.), *aff'd*, 665 F.2d 10 (2d Cir.1981).

Plaintiff argues that Samjens omitted and misrepresented material facts concerning the antitrust implications of the proposed takeover. Samjens' Offer To Purchase discusses the antitrust implications of the takeover as follows:

The Antitrust Division and the FTC frequently scrutinize the legality under the antitrust laws of transactions such as the proposed acquisition of Shares by the Purchaser pursuant to the Offer. At any time before or after the consummation of any such transactions, the Antitrust Division or the FTC could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the transaction or seeking divestiture of

the Shares so acquired or divestiture of substantial assets of the Partnership, its direct or indirect partners and/or the Company. Private parties may also bring legal action under the antitrust laws under certain circumstances.

The Company has commenced an action against the Partnership, Dominion, Mr. Edelman and others alleging, among other things, that the proposed acquisition of the Company by the Partnership would violate Section 7 of the Clayton Act. The defendants deny all material allegations in such complaint and will contest them vigorously.

This discussion fails to delineate any facts whereby a person might determine the viability of any potential antitrust consequences of the merger. Rather, the discussion simply and inadequately states the obvious point that certain government entities and private parties might choose to challenge the takeover and that Burlington has challenged the takeover.

■■ Amendments to the Schedule 13D and Schedule 14D–1 have, however, included copies of Burlington's complaint and amended complaint in this action. These complaints ably set forth the basis of any antitrust problems that attend this takeover attempt, and the attachment of these complaints to the relevant schedules cures the inadequacies of defendants' earlier filings. The court would note, however, that a bidder will not always satisfy this rule by filing an adversary's complaint. A complaint provides a sufficient disclosure only when it contains, as here, the "basic facts" giving rise to the potential antitrust problem.

### *(iii) Defendants' Disclosures Regarding Plans To Sell Certain Assets Or Divisions Of Burlington.*

■■ 17 C.F.R. S 240.14d–100, Item 5(b), requires a bidder to disclose the purpose or purposes of the tender offer as well as any plans for or relating to the subject company. The bidder must also disclose "any plans or proposals which relate to or would result" in a "sale or transfer of a material amount of assets of the subject

company or any of its subsidiaries." Samjens' Offer to Purchase states, in response to this requirement, that:

The Purchaser currently anticipates that it will sell certain of the Company's businesses as going concerns. In this connection, although the Purchaser has analyzed, based on limited information, the effect of potential sales of various of the Company's businesses, no final determination as to the sale of any particular business has been made.

Plaintiff argues that this disclosure contains material omissions and is materially misleading.

Plaintiff first argues that the statement that Samjens based their analysis "on limited information" is misleading because it does not disclose the inside information Samjens allegedly possessed. As with other allegations relating to inside information, the court will defer discussion of this allegation to the portion of the opinion which discusses section 14(e).

Plaintiff next argues that Samjens has, in fact, made a final decision with respect to their divestiture plans. Plaintiff calls the court's attention to memorandums which identify the divisions to be divested in the proposed takeover and which state that "[t]he success of the transaction may be dependent upon the completion of a divestiture program" and which refer to the asset sale as part of "the Dominion/Edelman plan." The court does not find these to be material misstatements. The Offer To Purchase clearly and fully states that Samjens anticipates selling assets after the acquisition. *See Dan River, Inc. v. Icahn,* 701 F.2d at 285–86, n. 2. Plaintiff's evidence fails to indicate that defendants have made a final decision to sell certain assets. The fact that defendants have formulated plans as to which assets they might sell if divestiture becomes necessary for "the success of the transaction" does not lead to the conclusion that defendants have finally determined to implement the "divestiture strategy" contained in "the Dominion/Edelman plan."

The cases plaintiff cites in support of its argument are inapposite. *Missouri Port-*

*land Cement Co.*, 498 F.2d at 872, holds that a bidder is not required to make predictions of future behavior and suggests such predictions might mislead the public into unjustifiably relying on those predictions. Plaintiff's other cases involve situations where the bidder positively misstated or completely failed to identify their plans. *See, e.g., Otis Elevator Co. v. United Technologies Corp.*, 405 F.Supp. 960, 969 (S.D. N.Y.1975) (where bidder has formulated merger plan, bidder liable when offer falsely stated it had no plan or proposal to merge); *General Host Corp. v. Triumph American, Inc.*, 359 F.Supp. 749, 755 (S.D. N.Y.1973) (bidder liable for failure to disclose intent to sell assets).

### (iv) Disclosures Regarding Financing Defendants Expected To Receive.

17 C.F.R. § 240.14d–100, Item 4, requires a bidder to disclose any plans to borrow funds to finance the tender offer. The bidder needs to disclose the terms and conditions of the borrowing, summarize the collateral given or to be given for the borrowing, and state "any plans or arrangements to finance or repay such borrowings." 17 C.F.R. § 240.14d–100, Item 4(b)(2). In response to this requirement, defendants' initial Schedule 14D–1 stated that:

> A bank syndicate led by First Chicago and Royal Bank of Canada ... is expected to provide a margin facility for the balance of the financing for the tender offer. The partnership has not yet requested nor received the Banks' commitment.... However, by the time the tender offer is launched it expects to have received a letter from the Banks stating that ... [the Banks] are confident they can arrange and lead syndication of the margin loan.

In connection with this statement, defendants filed copies of the letters they received from these banks. These letters, in essence, state that the banks have not committed to provide financing and will need to analyze the transaction in detail before deciding whether to provide financing.

Plaintiff complains that Samjens' filing was misleading in that it states that Samjens "expects" to receive a letter from the banks indicating that the banks are "confident" they can arrange the margin loan when, in fact, Samjens' expectations were not met. Plaintiff argues that "[b]y not disclosing the lack of success in these ongoing efforts, Samjens omitted a fact the disclosure of which was 'necessary in order to make the statements made not misleading.'"

 The court disagrees. Defendants fully disclosed the current status of the financing arrangements regarding the margin loan by including copies of the letters from the banks. The court does not regard defendant's subjective thoughts regarding the probability of receiving these letters as misleading in light of defendant's disclosure.

 Finally, even if defendants' disclosures were misleading, the court would not grant injunctive relief on that basis. A recent amendment to Samjens' Schedule 14D–1 discloses the financing Samjens intends to use in connection with the tender offer. Many decisions recognize that the remedy for a faulty securities filing is to grant an injunction until the filer corrects the filing. This court could not equitably grant an injunction based on Samjens' filings after Samjens has corrected the parts plaintiff alleges were misleading.

### D. The Section 14(e) Claims

 Section 14(e) of the Williams Act makes it "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer...." 15 U.S.C. § 78n(e). This broad antifraud provision, modeled after SEC Rule 10b–5, seeks to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision whether or not to tender their shares.

*Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 10, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). The SEC has promulgated regulations setting out the acts and practices violative of section 14(e). Rule 14e–3 prohibits insider trading during a tender offer. T. Hazen, *The Law of Securities Regulation* § 11.15 (1985).

After considering the evidence, the court determines that plaintiff has demonstrated a likelihood of success on the merits, or, at least, "serious questions" about the merits of its insider trading claim. This section of the opinion will delineate the evidence that supports this determination. The court emphasizes that this discussion only addresses what the evidence "tends" to show; the parties are not to regard this evidence as established for any purposes other than as it relates to this preliminary injunction motion. Having delineated the evidence, the court will then discuss the relevant law and explain how the court reaches the conclusion that plaintiff is likely to succeed on the merits of its insider trading claim. The evidence supporting plaintiff's insider trading claim is as follows:

1) James Ammeen worked for Burlington from 1962 to 1985. From 1980 to November 11, 1985, he was Executive Vice President of Burlington and served on Burlington's Executive Policy Committee (Dep. Ammeen 8–18). As a result of his position and duties, Ammeen possessed confidential nonpublic information about Burlington and its divisions (Hughes Aff.). Defendants' arguments contesting this fact are clearly frivolous.

2) From each of the divisions for which he had responsibility, Ammeen received nonpublic financial information including quarterly profit results and analyses, annual profit plans, plant profiles, and mission statements. These materials covered all aspects of operating results, capital expenditures, investment plans, and business forecasts for divisions whose combined sales provided approximately 50% of Burlington's revenues (Hughes Aff. ¶ 3; Dep. Ammeen 25). In addition, as a member of the Executive Policy Committee, Ammeen regularly received additional, nonpublic financial information.

3) Burlington regards the information Ammeen received as confidential. Burlington reasonably claims that the information is competitively sensitive and that divulgence of the information would be very valuable to competitors and very damaging to Burlington (Hughes Aff ¶ 8). Indeed, Burlington requires all senior executives to sign agreements promising to keep all such information confidential.

4) In November, 1985, Ammeen's employment at Burlington terminated. Ammeen and Burlington entered into a formal termination contract, dated December 5, 1985. Burlington agreed that, in addition to other benefits due him, Ammeen would receive $200,000.00. In return, Ammeen agreed that "now and in the future [he] will not disclose to any person, unless authorized to do so by the [c]ompany, any of the [c]ompany's trade secrets or other information which is confidential or secret." The contract defines "trade secrets or confidential information" broadly to include the various sorts of financial information regarding Burlington to which Ammeen had been privy (Dep. Edelman Ex. 2). Ammeen also agreed that he would "now and in the future ... continue to evidence a spirit of friendship and good will toward the [c]ompany, its subsidiaries and management ... [and] not disparage the [c]ompany's products, management or reputation, nor conduct [his] affairs in any way having such effect" (Dep. Edelman Ex. 2). Finally, Ammeen agreed that for a period of ten months he would not "directly and indirectly make advisory services to or become employed by or participate or engage in any business materially competitive with [Burlington] without the prior consent of the [c]ompany."

5) In the months preceding his departure from Burlington, Ammeen met on several occasions with PaineWebber officials and employees. Ammeen began working closely with PaineWebber on a number of projects associated with the textile industry (Dep. Neff 53 and Ex. 3 at 11408). Paine-

Webber eventually indicated a willingness to invest in a textile project in which Ammeen was involved or for which he had great enthusiasm (Dep. Neff 36). At about this same time, PaineWebber and Ammeen identified Burlington as a potential acquisition target (Dep. Ammeen 88–89). Indeed, in August 1986, at PaineWebber's request, PaineWebber employees met with senior officers of Cone Mills Corporation, a Greensboro-based textile company (Trogden Aff ¶ 9). At this meeting, PaineWebber presented a plan for a hostile cash tender for Burlington (Trogden Aff ¶ 9). Cone Mills indicated that it was not interested in pursuing PaineWebber's plan.

6) In the fall of 1986, PaineWebber and Ammeen approached Dominion with its takeover plan (Dep. Bell 40–41, Dep. Neff 149). Contemporaneous with the approach to Dominion, PaineWebber and Ammeen contacted Edelman (Dep. Edelman 22, 37–38). Neither Dominion nor Edelman had considered the possibility of acquiring Burlington prior to the contact by PaineWebber and Ammeen. (Dep. Bell 43, Dep. Edelman 19–20). In conjunction with these contacts, PaineWebber provided data evaluating Burlington's business.

7) The Dominion management prepared a presentation on the proposed takeover (project name "Battleship") for a December 17, 1986 meeting of the Dominion Board. After considering the presentation, the Dominion Board decided not to pursue the proposed acquisition. The Board based its decision, in part, on the absence of reliable asset valuations (Dep. Bell 113–16 and Ex. 3). The day after the Board's rejection of the proposal, Charles McCrae, an executive vice-president for Dominion, met with Ammeen in PaineWebber's New York offices. McCrae had earlier expressed concern about the legality of Ammeen's participation, and Dominion consulted counsel about Ammeen's participation (Dep. McCrae 95–101). McCrae and Ammeen discussed Dominion's concern about the valuation of the assets and the availability of potential buyers for some of Burlington's businesses (Dep. McCrae 135–40). These concerns apparently stemmed from the fact that the financing of the proposed lever-

aged buy-out would require the disposition of part of Burlington's assets (Dep. Neff Ex. 3 at 11446–47).

8) During December 1986 and January 1987, PaineWebber analysts undertook a more elaborate analysis of Burlington. PaineWebber compiled the results of this analysis in a book entitled "Battleship Preliminary Valuation Estimates." This book contains estimated actual financials for each division of Burlington for the fiscal year ended 1985, including its profit and loss results, its assets and liabilities, and its valuation for possible sale (Dep. Durra Ex. 1). Burlington believes this type of information competitvely sensitive, and, thus, Burlington does not make this data available to the public (Hughes Aff.).

9) Upon receiving PaineWebber's valuations, Dominion's management convened a special Board meeting, on February 19, 1987 (Dep. Bell Ex. 5), to discuss the proposed buyout. Thomas Bell, Chairman, President, and Chief Executive Officer of Dominion, testified that a proposed agenda for that meeting called for Ammeen, because of his detailed knowledge of Burlington, to brief the Board on the selection of retained businesses and those which would be disposed of in the leveraged buyout (Dep. Bell 140–42, 147). While the final agenda called for PaineWebber representatives to conduct the review of business valuations, Ammeen did nonetheless address the Board after PaineWebber's presentation concerning "the valuation of each unit of [Burlington]" (Dep. Bell Ex. 8). In this presentation, Board members asked Ammeen questions "pertaining to the business, what kind of business, how it had run, what was its performance, what was the machinery like...." Some of the questions were general and some addressed "specific divisions" of Burlington. Board members specifically asked Ammeen, "in terms of specific numbers," about "the operating results of these specific divisions" and "the valuation of these divisions." Ammeen answered these "questions in the context of the valuations that were on there. He felt they [the numbers] were in the ballpark" (Dep. Bell 182–84).

10) The presentations of PaineWebber and Ammeen allayed the Board members' concerns about the valuation data and disposition values of the segments of Burlington's business (Dep. Bell 199). The Board voted at its regular meeting, on February 24, 1987, to proceed with negotiations between Edelman, PaineWebber, and Ammeen. Thereafter, Edelman and Dominion formed Samjens (Dep. Bell 205).

11) Discussions went forward with Ammeen concerning remuneration for his participation in the venture. Samjens offered Ammeen more than $500,000 in annual salary and an equity interest (Dep. McCrae 158, Dep. Bell 208–11). Ammeen was also negotiating for 10% of Samjens' net profit from its attempt to acquire Burlington should the takeover not succeed (Dep. Edelman 409, Dep. Horowitz 250–51). Samjens had offered him 5 to 7½% of these profits (Dep. Ammeen 193–99). Prior to mid-April there was no indication that Samjens would be unable to reach an agreement with either PaineWebber or Ammeen (Dep. McCrae 223, Dep. Edelman 82, 182–87).

12) In response to a news report concerning the possibility of a hostile takeover of Burlington, the Chief Executive Officer of Burlington telephoned the Chief Executive Officer of PaineWebber concerning Ammeen's participation (Aff. Bond ¶ 4). PaineWebber's CEO engaged outside counsel to consider the matter (Dep. Marron 141). After this call and counsel's investigation, contract negotiations concerning indemnification took on "added significance" for PaineWebber (Dep. Horowitz 282). PaineWebber revised its demand for indemnification, insisting upon indemnification that extended back to the date that PaineWebber began working with Samjens. PaineWebber requested specific language indemnifying it for claims arising from PaineWebber's provision to Samjens of information about Burlington (Dep. Horowitz 304, 363–64; Dep. Neff Ex. 14). Samjens believed PaineWebber's request for indemnification "unusual," and Edelman inferred that PaineWebber was concerned about its exposure for lawsuits alleging the receipt of inside information from Ammeen (Dep. Edelman 149–50, 163; Dep. Horowitz 279).

At a meeting on or about April 22, 1987, Edelman asked the PaineWebber representatives whether they had received "inside information" (Dep. Edelman 218–20).

13) Samjens eventually offered to accede to PaineWebber's requested indemnification in return for signed, written representations from both PaineWebber and Ammeen that no inside information had been received or transmitted by PaineWebber (Dep. Horowitz 292–93, 327, 330). PaineWebber drafted, but never signed, an equivocal representation that the information PaineWebber provided to Samjens, in the Battleship book, was "to the best of PW's Knowledge and in material respects, taken as a whole, ... derivable from publicly available data...." (Dep. Neff Ex. 13; Dep. Horowitz 334). Ammeen refused to sign a similar statement (Dep. Horowitz 360).

14) PaineWebber and Samjens could not reach an agreement on indemnification and certain other matters, and, on April 23, 1987, PaineWebber delivered to Samjens a letter terminating negotiations (Dep. Horowitz 172–76). The next day, Ammeen also terminated negotiations with Samjens.

■ Borrowing from the cases interpreting rule 10b–5, the court determines that a private plaintiff must prove the following elements under Rule 14e–3 to demonstrate insider trading during a tender offer: (1) standing; (2) breach of duty; (3) materiality; (4) scienter; and (5) injury. *See Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 744 (5th Cir.1984); *SEC v. Tome,* 638 F.Supp. 596, 620 (S.D.N.Y.1986). As previously discussed, a target company has standing to assert an insider trading violation under Rule 14e–3. The court will discuss the requirement of an actual or anticipated injury in the section of the opinion concerning the balancing of the hardships.

### (i) Breach of Duty

■ Plaintiff must first demonstrate that a defendant breached a duty of disclosure. A duty of disclosure arises from the relationship between corporate insiders—directors, officers, and other persons within

the corporation who have access to confidential corporate information—and shareholders of the corporation. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 10 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The duty-bound person, to avoid a breach of duty, must either disclose the insider information or abstain from trading in the stock of the corporation. *See Chiarella v. United States*, 445 U.S. 222, 229–31, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980).

As a corollary to the "disclose or abstain" rule, an insider has a duty not to disclose (tip) inside information to third parties for the purpose of gaining a personal benefit. *Dirks v. SEC*, 463 U.S. 646, 662, 103 S.Ct. 3255, 3265, 77 L.Ed.2d 911 (1983). In turn, the recipient of a tip (the tippee) from an insider, who knows that the insider (the tipper) is seeking to benefit from the tip, incurs a similar duty to disclose the information or abstain from trading. *Id.*

■ The evidence clearly indicates that Ammeen owed both a contractual and a fiduciary duty to Burlington not to disclose inside information for personal gain. As *Dirks* elucidates, a former corporate officer, such as Ammeen, retains the status of an "insider" despite the cessation of employment with the corporation. *Dirks*, 463 U.S. at 670, 103 S.Ct. at 3269.

The evidence also indicates that Ammeen breached his duty by tipping, with the intention of profiting thereby, inside information to the members of Samjens. Ammeen was intimately associated with PaineWebber during the period of time when PaineWebber produced its financial studies of Burlington. Even if Ammeen did not participate in these studies, the Bell deposition clearly indicates that Ammeen addressed the Dominion Board about this information, fielded questions about this information, and indicated that PaineWebber's calculations concerning information Burlington keeps secret were in the ballpark. This fact alone likely establishes that Ammeen transmitted inside information to a member of Samjens.

Furthermore, defendants cannot seriously dispute that Ammeen stood to benefit personally from his actions. Samjens and Ammeen were negotiating a contract whereby Ammeen would manage Burlington and receive an equity interest. In the event the takeover proved unsuccessful, Ammeen and Samjens contemplated that Ammeen would receive somewhere between 5% and 10% of the net profits flowing from Samjens' sale of the acquired Burlington stock. Accordingly, plaintiff will likely be able to prove that Ammeen breached his duty to Burlington.

■ As a result of Ammeen's breach, the Samjens partners, as tippees, incurred a duty to disclose the information or to abstain from trading in Burlington stock. *Dirks* clearly teaches that a tippee's duty to disclose or abstain is derivative. *Dirks*, 463 U.S. at 659, 103 S.Ct. at 3264. "The tippee's obligation ... [arises] from his role as a participant after the fact in the insider's breach of a fiduciary duty." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313, 105 S.Ct. 2622, 2630, 86 L.Ed.2d 215 (1985). By not disclosing the inside information furnished and verified by Ammeen, Samjens likely breached their duty owed to Burlington's shareholders. Accordingly, plaintiff is likely to succeed in showing a breach of duty.

### (ii) Materiality

■ Plaintiff must also demonstrate that the inside information is material. Information is material when "there is a substantial likelihood that a reasonable shareholder would consider [the information] important" in deciding whether to sell, tender, or hold its shares. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The test does not require a showing that a reasonable shareholder, if exposed to the information, would have changed its decision. *Id.* "What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* While materiality may be characterized as mixed question of law and fact, "involving as it does

the application of legal standards to a particular set of facts," *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133, the materiality determination actually "is a highly factual one." T. Hazen, *The Law of Securities Regulation* § 11.4 (1985). In general, the cases track the common law of misrepresentation which states that opinion, predictions, intention, and mere statements of value—as opposed to valuations by independent experts—are not usually actionable. *Id.*

The Battleship Plan contains, among other things, information about Burlington's divisional sales, earnings, and asset valuations. Burlington does not publicly release such extensive divisional data. The court reasonably can infer that Ammeen indirectly contributed to the preparation of the plan. Clearly, Ammeen was aware of the figures contained in the plan. Ammeen also put his stamp of verification on the figures at the February 19, 1987 meeting with Dominion's Board. Ammeen not only referred to the figures during his presentation, but also indicated that the figures were reliable. At the same meeting, Ammeen answered questions concerning asset valuation, operating results, past profitability, and information about employees and equipment. Persuaded by Ammeen's overall presentation, Dominion disregarded its previous apprehensions and decided to attempt a takeover of Burlington.

■ The court believes the information Ammeen conveyed and verified to be material. This information is not "of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Industries,* 426 U.S. at 448, 96 S.Ct. at 2132. Ammeen discussed non-public divisional facts, such as sales, earnings, and profits. This financial information, standing alone, is material. In *General Portland, Inc. v. LaFarge Coppee S.A.,* the court stated that "detailed plant-by-plant operating data" is "particularly relevant" to a shareholder's determination of whether the tender offer price is fair. [1982–83 T.B.] Fed.Sec.L.Rep. (CCH) Paragraph 99,148, p. 95,545 (N.D.Tex.1981) [Available on WESTLAW, DCT database].

In addition, the Third Circuit recently held that sales information is material:

Unquestionably a factfinder could draw the reasonable inference that a reasonable investor would see the obvious connection between increased revenues and the likelihood of increased profits. The finding that a reasonable investor would consider the sales information to be "objective, valuable, material knowledge" ... is not clearly erroneous.

*Rothberg v. Rosenbloom,* 771 F.2d 818, 821 (3rd Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987). The *Rothberg* court described sales information as "hard information," as opposed to "a guess or prediction." *Id.*

The Fourth Circuit has commented on the view that sales information is material, stating that such a view "arguably has merit." *Walker v. Action Industries, Inc.,* 802 F.2d 703, 710 (4th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). The *Walker* court, however, expressed some concern that sales information, standing alone, could mislead investors into believing a company is profitable when in fact costs exceed revenues. In the instant case no such confusion would ensue; Ammeen apparently disclosed or verified not just divisional *sales,* but also divisional *profits* and earnings. *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 495 F.2d 228, 235–36 (2d Cir.1974) (substantial decline is earnings is material information). Absent contexts in which a risk of stockholder confusion accompanies a disclosure, the Fourth Circuit has not been bashful in finding hard information to be material. *See Lockspeiser v. Western Maryland Co.,* 768 F.2d 558 (4th Cir.1985) (number of tons of coal and amount of standing board feet of timbers material where coal and timber represented the company's two most valuable assets).

Dominion's reaction to Ammeen's presentation of the information provides additional evidence of materiality. Following Ammeen's presentation, Dominion shed its previous reluctance and decided to attempt a takeover of Burlington. This change of position is "strong circumstantial evidence

of materiality." T. Hazen, *The Law of Securities Regulation,* § 13.5 (1985). Thus in *Rothberg, supra,* the Third Circuit stated that *"[t]he best proof of materiality* of the [sales] information is that the joint venturers, themselves experienced investors, found it to be sufficiently material to form the joint venture and to purchase ... stock...." 771 F.2d at 821 (emphasis added). *See SEC v. Shapiro,* 494 F.2d 1301 (2nd Cir.1974); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2nd Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *General Portland, Inc. v. Lafarge Coppee, S.A.,* [1982–83 T.B.] Fed.Sec.L.Rep. (CCH) at p. 95, 544. *See also Walker,* 802 F.2d at 710 n. 13 (Fourth Circuit suggests that limitations on the scope of "materiality" might be different in insider trading cases).

In addition, not only did Ammeen apparently disclose "hard" facts, he coupled these disclosures with other, "softer" information, such as valuations of divisions and assets and opinions on which businesses to divest. Standing alone, such softer information may not cross the materiality threshold. *See Walker,* 802 F.2d at 709. The hard and soft information combined, however, "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries,* 426 U.S. at 438, 96 S.Ct. at 2126. *See* T. Hazen, *The Law of Securities Regulation,* § 11.4 (1985) ("Material information is that which would affect the total mix").

Finally, the court cannot assess the question of what information is material in a vacuum. The fact that the information comes from an executive, who worked 23 years at Burlington and who was privy to the company's confidential information, heightens the credence a reasonable shareholder would attach to such information.

The court thus concludes that the information in question is likely material. At the very least, a serious question is presented. The court notes that doubts as to the materiality of information should be resolved in favor of a finding of materiality. In determining the required disclo-

sures under Rule 14a–9 of the proxy provisions, the Supreme Court stated:

> Doubts as to the critical nature of information misstated or omitted will be commonplace. And particularly in view of the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within management's control, it is appropriate that these doubts be resolved in favor of those the statute is designed to protect.

*TSC Industries,* 426 U.S. at 448, 96 S.Ct. at 2132.

#### (iii) Scienter

Finally, a plaintiff must prove scienter. *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–194, n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668 (1976). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Hochfelder,* 425 U.S. at 193–194, n. 12, 96 S.Ct. at 1381, n. 12. In both *Aaron* and *Hochfelder,* the Supreme Court expressly refrained from deciding "whether, under some circumstances, scienter may also include reckless behavior." *Aaron,* 446 U.S. at 686 n. 5, 100 S.Ct. at 1950 n. 5. Since *Hochfelder,* however, the circuit courts have agreed that "recklessness" is a sufficient level of awareness on which to base an action, at least when the action is brought by a private plaintiff. T. Hazen, *The Law of Securities Regulation* § 13.4 (1985). "Recklessness is obviously a matter of degree and requires something considerably more than negligent conduct but which still falls short of actual intentional action." *Id.*

The evidence suggesting that Samjens acted with scienter, in implementing its tender offer, is replete. The members of Samjens and PaineWebber knew of Ammeen's former relationship with Burlington and the fiduciary and contractual duties arising from that relationship. Indeed, Ammeen's involvement concerned Dominion from the outset. Charles McCrae, Dominion's Executive Vice President, discussed with Ammeen the latter's relationship with Burlington. McCrae also consult-

ed counsel about the propriety of Ammeen's involvement with the takeover plan. Similarly, Edelman expressed concern about Ammeen's former relationship with Burlington and explicitly asked Ammeen whether Ammeen had passed inside information to PaineWebber.

In addition, the Samjens partners knew of Ammeen's relationship with PaineWebber during the period of time when PaineWebber was preparing its financial evaluations of Burlington and, therefore, knew of the clear opportunity Ammeen had to pass inside information. Furthermore, Ammeen actually discussed financial information concerning Burlington at a Dominion board meeting.

Finally, both Dominion and Edelman viewed PaineWebber's and Ammeen's request for indemnification "unusual." Indeed, both PaineWebber and Ammeen refused to sign a written representation to the effect that they had neither received nor transmitted inside information.

Based on the totality of this evidence, the court concludes that plaintiff has a substantial likelihood of proving that the members of Samjens acted with scienter. Edelman's and Dominion's knowledge, combined with their documented suspicions about PaineWebber's and Ammeen's conduct, strongly suggests at least reckless action. And Ammeen's vigorous pursuit of the tender offer despite his contractual and fiduciary duties manifests, at the least, reckless disregard for the lawfulness of his acts.

### III. THE PROPRIETY OF INJUNCTIVE RELIEF

As previously stated, the court must evaluate the interplay of four factors in determining whether to grant a preliminary injunction: (1) the probable irreparable harm to the moving party if the preliminary injunction is not issued; (2) the probable harm to other parties or persons if the preliminary injunction is issued; (3) the likelihood of the moving party succeeding on the merits of the underlying claim; and (4) the public interest. *See Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981); *North Carolina State Ports Authority v. Dart Containerline Co., Ltd.,* 592 F.2d 749 (4th Cir. 1979); *Fort Sumter Tours, Inc. v. Andrus,* 564 F.2d 1119, 1124 (4th Cir.1977); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977). Of these factors, "the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance [of potential injury] is struck in favor of the plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented." *Ports Authority,* 592 F.2d at 750. Furthermore, "[t]here is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify the issuance of the injunction." *Blackwelder Furniture Co.,* 550 F.2d at 196. Finally, the trial court must evaluate the "public interest." *Id.,* 550 F.2d at 197.

The Fourth Circuit has held that these aforementioned standards "are fully applicable in cases involving tender offers and the strictures of the Williams Act." *Dan River, Inc. v. Icahn,* 701 F.2d at 283 (citing *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975)) (construing sections 13(d), 14(d), and 14(e) of Williams Act).

At this juncture, the court has concluded that plaintiff's evidence demonstrates a likelihood of successfully proving all the elements necessary to establish a violation of section 14(e) of the Williams Act. At the very least, plaintiff raises "serious questions" about that claim. The legality of a tender offer is brought into grave question where the evidence shows that a former executive of the target corporation, who possesses the target's confidential information, acts as a catalyst for and a consultant to a takeover attempt. Defendants would

have the court believe that Ammeen helped conceptualize a plan for a hostile takeover and helped convince previously uninterested parties to participate in this plan while, at the same time, delicately treading just above the line between legality and illegality. The court, however, cannot ignore evidence that strongly suggests that Ammeen dipped below the line into the realm of illegality. Any bidder or potential bidder who teams with an insider does so at the risk of creating a compelling appearance of impropriety. Similarly, an insider's decision to participate in a hostile takeover attempt carries the same risk and compelling appearance of impropriety. The circumstances and the evidence persuades this court to conclude that plaintiff is likely to succeed on the merits of its claim.

Injunctive relief does not, however, follow merely from plaintiff's presentation of a likelihood of success on the merits of its claim under section 14(e) of the Williams Act. The court must also balance the probable harms to the parties that would accompany the grant or denial of an injunction.

On the one hand, Burlington will suffer irreparable harm of the highest order if this court fails to grant injunctive relief. Burlington's shareholders are presently being asked to decide whether to sell, tender, or hold their stock in a market where two competing tender offers exist. In addition, Burlington management is fervently contesting the validity of one of these tender offers. The courts have recognized, that in this situation, "shareholders may be exposed to a bewildering variety of conflicting appeals and arguments designed to persuade them either to accept or to reject the tender offer." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 285 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (quoting 113 Cong.Rec. 855–56 (1967) (remarks of Senator Williams)). The provisions of the Williams Act, especially section 14(e), were specifically designed to protect shareholders faced with the situation attending this lawsuit. The statute seeks to accomplish this laudable goal by ensuring that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision of whether to sell, tender, or hold their shares. *Schreiber*, 472 U.S. at 10, 105 S.Ct. at 2464; *Piper*, 430 U.S. at 35, 97 S.Ct. at 946. It is this peculiar fact, that tender offers force a shareholder to decide whether to dispose of his shares at some premium over the market or retain them with knowledge that the offeror may alter the management of the target company to its detriment, that causes the needed regulation. *See Piper*, 430 U.S. at 35, 97 S.Ct. at 946.

If this court fails to issue an injunction, Burlington's shareholders stand to suffer the exact injury the Williams Act strives to prevent. Samjens appears to possess illegally obtained inside information that a reasonable shareholder would consider important in deciding a course of action in this veritable sweepstakes to acquire Burlington. Yet Burlington's shareholders are not privy to this information. To allow Samjens to proceed with a tender offer would be patently unfair. A clearer case of irreparable injury of the type the Williams Act seeks to remedy is unimaginable.

 Nevertheless, defendants claim that the grant of an injunction will injure Burlington's shareholders, not protect them. Defendants argue that the best situation for Burlington's shareholders is for this court to allow a bidding war between the two bidders now present in the marketplace. Defendants especially note that they are currently the high bidder. The court rejects defendants' argument. This argument asks the court to assume that the bidders will continue to raise the bids and the court cannot make that assumption. Alternatively, this argument asks the court to assume that Samjens' current high bid will remain the high bid, another assumption the court will not make. More importantly, the securities laws nowhere contemplate that a court should base judicial rulings on the fluctuating price per share that shareholders will or might receive. Section 14(e) does not guard against substantive unfairness in a tender offer. "[T]he sole purpose of section 14(e) is to

ensure adequate disclosure to shareholders so that they may make informed decisions whether or not to tender their shares." *Dan River, Inc. v. Icahn* 701 F.2d at 288. As the Supreme Court has stated:

> Congress' consistent emphasis on disclosure persuades us that it intended takeover contests to be addressed to shareholders. In pursuit of this goal, Congress, consistent with the core mechanism of the Securities Exchange Act, created sweeping disclosure requirements and narrow substantive safeguards. The same Congress that placed such emphasis on shareholder choice would not at the same time have required judges to oversee tender offers for substantive fairness.

*Schreiber*, 472 U.S. at 12, 105 S.Ct. at 2465. Defendants' argument, if adopted, would lead to the ludicrous result that, regardless of the extent to which a tender offer is tainted with illegality, a tender offeror could always avoid an injunction simply by outbidding competing tender offerors.

Against the patent and invidious irreparable harm to plaintiff if the court fails to issue an injunction, the court must balance the harm to defendant if the court issues an injunction. Samjens contends that the grant of an injunction will forever prevent the Partnership Defendants from pursuing an opportunity, to wit, the acquisition of a substantial American textile company. More specifically, Samjens avers that an injunction will cause the loss of an opportunity—the opportunity to acquire Burlington Industries—in which they have invested substantial sums of money and effort.

While the loss of an opportunity is an irreparable harm, the court, for several reasons, does not deem this harm to be of the magnitude of plaintiff's harm. First, the opportunity Samjens claims must be viewed as the opportunity to attempt a *lawful* acquisition of Burlington. Samjens has no right to attempt an unlawful acquisition of Burlington. Samjens' decision to enlist Ammeen's aid jeopardized their opportunity from the outset and Samjens realized the risks posed by their association with Ammeen. Second, Samjens' argument parallels plaintiff's contention that Burlington will suffer harm because of its loss of its present corporate existence. Essentially plaintiff argues that losing Burlington is an irreparable injury. Defendants cannot deny plaintiff's argument and, at the same time, assert that their own loss of Burlington is an irreparable injury. Third, this injunction does not, as defendants argue, forever prevent Samjens from acquiring Burlington. The competing bidder may prove unable to consummate its proposed tender offer. Similarly, defendants may successfully enjoin this competing tender offer in the Southern District of New York. Fourth, an injunction would simply not prevent Samjens from entering into a textile business in the United States. Samjens would remain free to attempt takeovers of other textile business, or, alternatively, Samjens could start its own textile business. Samjens fervently argues in its antitrust brief, for instance, the ease with which new competitors can enter into the denim manufacturing business. Finally, defendants will not suffer any financial loss if this court enjoins their tender offer. Samjens stands to make a tremendous profit from their securities transactions even if the tender offer does not go forward since they purchased their present shares of Burlington stock at prices far below the prevailing market price.

Ammeen also argues that he would suffer irreparable harm if this court issues an injunction against him. Ammeen asserts that an injunction will cause grave damage to his reputation, his position in the textile industry, and his possibilities of obtaining future employment. The court recognizes that Ammeen might suffer some of the claimed harms if an injunction is granted. But these harms are insubstantial compared to the risk that Ammeen might continue to improperly utilize or divulge inside information. Ammeen responds by arguing that Burlington must prove a risk of imminent disclosure by Ammeen. The court concludes that Burlington proved that risk by showing the likelihood that Ammeen made purposeful disclosures of inside information in the past. The law Ammeen cites requiring proof of imminent

disclosure merely indicates that injunctions are inappropriate if based solely on the risk of harm incident to *inadvertent* disclosures. *See Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 358–59 (3d Cir.1980).

Finally, the court notes that the public interest favors granting this injunction. The courts allow private plaintiffs to seek injunctive relief under the Williams Act in order to further investor protection. *Piper*, 430 U.S. at 31–34, 97 S.Ct. at 944–45. Additionally, public policy favors the grant of an injunction where the injunction is necessary "to preserve the ability of the court to render complete relief." *Federal Leasing*, 650 F.2d at 499. In the absence of an injunction, a risk exists that Samjens will takeover Burlington and dismiss this action, thereby precluding this court from adjudging the substantial substantive claims presented.

Defendants nonetheless argue that the public interest does not favor the grant of an injunction. Defendants cite case law stating that the purpose of injunctive relief is to preserve the status quo and argue that the status quo herein is a bidding war between two tender offerors. The court agrees that, in the ordinary case, a basic purpose of an injunction is to preserve the status quo. But the law recognizes that there are cases, such as this litigation, where irreversible change will occur, whether or not the court grants an injunction. "In such cases the purpose to preserve the situation for effective final decision cannot be accomplished, and the court must simply balance hardships." D. Dobbs, *Remedies* § 2.10 (1973).

## CONCLUSION AND ORDER

■ Burlington has shown a likelihood that it will be able to prove that Samjens utilized inside information received from Ammeen in connection with Samjens' tender offer. Burlington has also demonstrated the likelihood of substantial irreparable injury if the court denies injunctive relief, and that this injury is more substantial than the injury defendants will suffer if the court grants an injunction. In addi-

tion, public interest considerations suggest that injunctive relief is appropriate in this case.

Inasmuch as plaintiff has failed to demonstrate a likelihood of success on its Rule 10b–5 claim, the court does not grant an injunction with respect to defendants' conduct prior to the commencement of the tender offer. Accordingly, defendants may exercise any legal rights associated with the Burlington stock defendants currently own. *See Dan River, Inc. v. Icahn*, 701 F.2d 278 (4th Cir.1983) ("sterilization" injunction denying tender offeror voting rights in target company's stock held improper). The court does, however, enjoin defendants from continuing the present tender offer and commencing an additional tender offer. The court also enjoins defendants from disclosing Burlington's inside information. The tender offer appears to have been commenced with and perpetuated by the unfair use of insider information, and, given this evolution, the court cannot sanction any purportedly curative disclosures—such as the release of Burlington's sensitive information to the public—which would have the attendant effect of exacerbating Burlington's injury.

IT IS THEREFORE ORDERED that defendants Edelman, Dominion, Samjens, and Ammeen, their agents, servants, controlled affiliates, and employees be, and the same hereby are, enjoined from:

(a) continuing or pursuing the tender offer, filed May 6, 1987, or any supplement or amendment thereto, and from accepting or purchasing any of the Burlington Industries Inc. common stock tendered pursuant to this tender offer;

(b) acquiring or attempting to acquire any shares of Burlington Industries, Inc. common stock or other securities pursuant to a tender offer or otherwise;

(c) making or attempting to make any tender offer or invitations for tenders or offers or invitations for tenders or offers to purchase any Burlington Industries Inc. common stock or other securities;

(d) disclosing any confidential inside information concerning Burlington Industries, Inc.

IT IS FURTHER ORDERED that, as a condition of the issuance of this order, plaintiff post a bond in the sum of five hundred million dollars ($500,000,000.00), as security for the payment of such costs and damages as defendants may incur or suffer if it is subsequently determined that defendants have been wrongfully enjoined.

IT IS FURTHER ORDERED that this injunction shall become effective and issued for service upon the posting of the aforementioned bond.

The court reserves the right to enter supplemental findings explicating portions of this opinion.