NEXT LEVEL COMMUNICATIONS, INC., a Delaware corporation, Next Level Partners, LLC, a Delaware limited liability company, Spencer Segura, and Jacqueline Segura, Plaintiffs,

v.

MOTOROLA, INC., a Delaware corporation, Defendant.

In re Next Level Communications, Inc. Shareholders Litigation.

C.A. Nos. 20144, 20114.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 20, 2003.
Decided: Feb. 25, 2003.
Revised: Feb. 26, 2003.

Kevin G. Abrams, Srinivas M. Raju, J. Travis Laster, Thad J. Bracegirdle, Kelly C. Ashby, Evan O. Williford, Lisa M. Zwally, Richards, Layton & Finger, P.A., Wilmington, DE; Hugh Steven Wilson, Latham & Watkins, L.L.P., San Diego, CA; Christopher L. Kaufman, Charles W. Cox, II, Latham & Watkins, L.L.P., Los Angeles, CA, for Plaintiffs in C.A. No. 20144 and Defendants Next Level Communications, Inc. and Michael J. Norris in C.A. No. 20114.

Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Gregory M. Castaldo, Schiffrin & Barroway, Bala Cynwyd, PA; Patricia I. Avery, Wolf Popper, L.L.P., New York City, for Plaintiffs in C.A. No. 20114.

Kenneth J. Nachbar, Jon E. Abramczyk, Susan D. Wood, Jason A. Cincilla, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; John A. Freedman, Craig B. Long, Angela J. Schowalter, Arnold & Porter, Washington, D.C., for Defendant in C.A.

No. 20144 and Defendants Motorola, Inc., Eugene Delaney, and Gray Benoist in C.A. No. 20114.

## OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

Plaintiff Next Level Communications, Inc. recently described itself as a "leading provider of broadband communications systems that enable telephone companies and other emerging communications service providers to cost-effectively deliver voice, data and video services over the existing copper wire telephone infrastructure." Next Level went public in November 1999, near the peak of the bubble in the telecommunications industry, selling approximately 12% of its common stock in an initial public offering priced at $50 per share. Beginning in 2000, Next Level has suffered a substantial decline in its revenue (from $150 million in 2000 to $57 million in 2002) and resulting net losses in excess of $360 million over the three-year period. After briefly trading at levels above $150 per share in 2000, the price of Next Level common stock has steadily fallen, reaching a low of $0.58 per share in the fourth quarter of 2002 in trading on the NASDAQ National Market System.

Defendant Motorola, Inc. owns approximately 74% of the outstanding common stock of Next Level, together with presently exercisable rights to acquire another 15% of those shares on a fully diluted basis. Motorola has two representatives on Next Level's seven-person board of directors. Motorola first acquired an interest in Next Level as the result of its January 2000 acquisition of General Instrument Corporation, which owned approximately 82% of Next Level's common stock. Since December 2000, Motorola has provided to Next Level approximately

$177 million in debt and equity financing and an additional $30 million in loan guarantees.

After conducting a lengthy strategic review of its investments, Motorola announced, on January 12, 2003, that it would make a tender offer to the holders of Next Level common stock to acquire their shares at $1.04 per share. That offer, now scheduled to close on March 4, 2003, is firmly conditioned on its acceptance by a majority of the minority-held shares and is accompanied by a commitment to effect a short-form merger eliminating non-tendering stockholders (other than those who seek appraisal) on the same cash terms, if the offer succeeds.

Next Level (as authorized by its board of directors) has recommended that its stockholders reject the Motorola tender offer. Moreover, both Next Level and individual Next Level stockholders have brought suit to enjoin that offer. Although their complaints make a variety of claims, the central allegation is that Motorola is in possession of material non-public information about Next Level that it is prohibited from disclosing and, therefore, is disabled from purchasing any shares of Next Level common stock. The complaints also charge that disclosures made by Motorola in connection with its tender offer are inequitably coercing Next Level stockholders into tendering their shares, thus destroying the otherwise voluntary nature of the transaction.

In this opinion, the court examines both the factual record developed in connection with the pending motions for preliminary injunction and the law governing Motorola's conduct as a majority stockholder. This process requires the court to focus on the nature of the non-public information in Motorola's possession and the quality and quantity of the information it has disclosed. In addition, the court is called upon to consider whether Motorola's tender offer is inequitably coercive in its structure or in its disclosure of the likely consequences to Next Level and its stockholders should the tender offer fail.

For the reasons explained in this opinion, the court concludes that Next Level and the other plaintiffs have failed to carry their burden of showing a reasonable probability of success on the merits of their claims. Rather, the record developed in connection with these expedited proceedings supports a conclusion that Motorola has fully and adequately disclosed all material information and that its tender offer is not inequitably coercive. In the circumstances, the decision to accept or reject Motorola's offer should be left in the hands of the Next Level stockholders. In making that investment decision, those stockholders will be able to consider not only the information furnished by Motorola but also the negative recommendation of their board of directors and other information furnished to the marketplace by Next Level management.

## II.

### A. The Parties

Next Level is a Delaware corporation headquartered in Rohnert Park, California. Next Level is in the business of providing integrated broadband access platforms for delivering a combination of voice, high-speed data and video services in homes or offices using existing copper telephone lines.

Plaintiff Next Level Partners, LLC beneficially owns more than 1,800,000 shares of Next Level common stock. Plaintiffs Spencer Segura and Jacqueline Segura each respectively own approximately 400,-000 and 200,000 shares of Next Level common stock. Several Next Level stockholder plaintiffs have also filed complaints that

were subsequently consolidated into one class action.[1]

Motorola is a global provider of wireless communications, semiconductors and advanced electronic systems and services. Motorola is a Delaware corporation headquartered in Schaumburg, Illinois. Motorola currently owns 74% of the common stock and 100% of the preferred stock of Next Level.

## B. *Motorola's History Of Financial Support For Next Level*

Over the past three years, Motorola has furnished significant financial support to a troubled Next Level. Next Level's first request of Motorola for financing or other forms of financial assistance came in December 2000 and January 2001. At that time, pursuant to the terms of a Tax Sharing and Allocation Agreement, Motorola advanced Next Level a total of $32.3 million.

On April 20, 2001, Next Level and Motorola entered into a Relationship Agreement to facilitate sales by Motorola, acting as a non-exclusive agent, of Next Level products. Under the Relationship Agreement, Motorola provided Next Level the services of sales account executives and support to help Next Level market to potential international customers. The Relationship Agreement also integrates the terms of a Non–Disclosure Agreement (the "NDA") that was executed the same day. The NDA was intended to protect certain confidential information related to sales and marketing exchanged by Next Level and Motorola. The NDA provides a precise procedure for designating certain sales information as "proprietary" or "confidential," such as requiring a confirmatory letter to designate oral communications as confidential, and provides that marketing information can be used "only in conjunction with entering into a business relationship for the sale of Next Level products."[2]

In April 2001, Next Level approached Motorola to guarantee a $75 million loan from Credit Suisse First Boston. When Next Level's CEO, Michael Norris, made this request, he provided to Motorola executives Edward Breen and Rick Severns, a report on Next Level's business stating, among other things, that:

- while Next Level was at an "inflection point," Next Level's goal was to be at a cash break even point by the fourth quarter of 2001;
- Next Level projected significant increased revenues for 2001 ($167 million) and 2002 ($250 million);
- Next Level's upgrade of its pilot program with Qwest Communications in Phoenix was "in process;" and
- Qwest had provided testimonial to the effect that it was "committed to broadband development."[3]

Shortly after this request for a guarantee, Next Level asked Motorola for direct funding. While discussing this potential

---

1. Plaintiffs in the class action have brought their action on behalf of those public stockholders of Next Level who are not affiliated with, or otherwise related to, any of the defendants. *See* the Amended Complaint filed in the action *Barry Feldman v. J. Michael Norris,* C.A. No. 20114, which has been deemed the class plaintiffs' operative complaint in the Order of Consolidation signed by the court on February 6, 2003.

2. PX 76.

3. DX 25. Next Level's actual revenues were approximately $93 million in 2001 and $57 million in 2002. Additionally, Next Level did not break even by the fourth quarter of 2001, and reported losses of $56.3 million for that quarter. Qwest has not expanded deployment of Next Level's technology in any significant respects since Norris provided this presentation to Motorola's executives.

"loan with Motorola," Norris stated that he:

> truly believe[d] [Next Level] is going to be one of Motorola's 'silver bullets' to bring it out of its slump. We have three big Telco's rapidly moving towards commercial deployment (Bell Canada, Telenor, and Qwest). Any one of these accounts moving to full commercial will send [Next Level's] stock through the roof.[4]

On May 16, 2001, Motorola and Next Level entered into a two-year, $60 million credit agreement (the "Credit Agreement"). The Credit Agreement provides for mandatory prepayment rights, under which Next Level agreed to repay the Motorola loan with proceeds from later financings.[5] The Credit Agreement also states that Next Level will provide Motorola with periodic financial updates, including "such other information regarding the condition, financial or otherwise, business or prospects of [Next Level] as [Motorola] may reasonably request."[6]

Although Norris represented that his projections indicated the $60 million loan would fund Next Level's operations for twelve months, by mid-June Norris requested additional financing for Next Level. Also in mid-June Norris wrote to Motorola that he had:

some good news surrounding your investment ... [because Norris's] focused efforts on Qwest, Bell Canada, Telenor and China [were] beginning to pay off ... [and] we were just informed by Bell Canada (over the phone) that they met yesterday and have decided to proceed with a commercial roll out of the Next Level platform.[7]

In the summer of 2001, Norris requested Motorola guarantee a $20 million loan secured by a mortgage on Next Level's headquarters. In response, Severns, a Motorola executive and member of Next Level's board, told Norris that Motorola wanted Next Level "to go after a strategic investor and [we] were not concerned if it resulted in dilution to Motorola ownership."[8] On July 10, Severns again told Norris that Next Level "should intensify [its] efforts to find a strategic investor," and that Motorola was "willing to suffer ... reasonable dilution."[9] After efforts by Next Level to obtain a third-party investor failed, Motorola eventually provided this guarantee.

On July 17, 2001, Norris notified Severns of discussions regarding a potential third-party financing with Merrill Lynch. After discussing the basic terms of the agreement, Norris suggested that, as an alternative, Motorola "do the same deal with us–I would rather give the money to

---

4. DX 26. None of these three customers has subsequently signed new, large contracts with Next Level.

5. Next Level refers to these provisions as "clawbacks" in its complaint. Prepayment terms, however, are not unusual in loan agreements, and in their Schedule 14D–9 Next Level acknowledges that the Credit Agreement's covenants are "standard." PX 81 at B–3. *See also* Ide Dep. at 25, 138–39 (Next Level CFO James Ide testified that the "clawback" provisions may not be atypical, and that Motorola had told him it would

waive these terms to help Next Level secure third-party financing.).

6. DX 15 at § 8.01(h).

7. DX 28. Bell Canada did not commit to a commercial rollout by September 2001, and to date has not made such a commitment. Nor have Qwest, Telenor or China Telecom committed to significant rollouts of Next Level's technology.

8. DX 29.

9. DX 30.

Motorola."[10] Shortly thereafter, Norris continued providing financial updates, including on:

- July 27, 2001: Norris reported "We remain on track with our tier one customers, which include Qwest, Bell Canada, Telenor and China."[11]
- August 6, 2001: Norris reported that he has retained Merrill Lynch to secure $40–$50 million in financing, and notes "providing Qwest or Bell Canada deliver, we would be able to raise money through a public offering."[12]
- September 10, 2001: Norris reported that a $1.2 billion proposal to Qwest to do a "six new cities ... 1.4M new subscribers [with] four-year roll out plan ... was very well received and is currently being discussed/negotiated with key members from Qwest...."[13]
- September 13, 2001: Norris sent a "Business Status" PowerPoint presentation entitled "Funding Scenarios," noting that Next Level was "receiving good feedback" from Qwest concerning its "$1 billion in sales to Next Level over 4 years proposal."[14]

The September 13 presentation also outlined several "funding scenarios" Next Level was considering, including a "Motorola Buy–Up of Remaining Ownership."[15] In September 2001, Motorola advanced Next Level an additional $4 million.

On September 26, 2001, Norris sent Breen and Motorola CEO Chris Galvin an update regarding a meeting with Qwest CEO Joseph Nacchio, expressing his hope Qwest "will roll out [Next Level's technology] in 2002."[16] Norris also noted that he had received approval for a $20 million mortgage, subject to a Motorola guarantee. Norris provided another update to Breen and Severns on October 26, reporting:

> what's happening at Qwest: 1. Broad agreement (1st time) to deploy [Next Level's] [technology] platform ... factional resistance pretty much gone.... [Nacchio] said 30–45 days for a decisions ... I'm convinced that they will deploy in 2002....[17]

## C. Next Level's Attempts To Obtain "Third–Party" Financing

Motorola has consistently encouraged Next Level to obtain independent financing for its operations. Moreover, Section 2.08(d) of the Credit Agreement expressly requires Next Level to refinance these loans as soon as possible.

In August 2001 Next Level retained Merrill Lynch to solicit third-party financing. Although Merrill Lynch and Next Level talked to 30 potential investors, these discussions proved largely unfruitful:

- As Norris has admitted, Next Level only recommended one written proposal ("Cavallo") to Motorola.
- The Cavallo term sheet "contained mandatory put rights to Motorola if Next Level's stock price did not appreciate by 43% within [the next 12

---

10. DX 31.

11. DX 32.

12. DX 33.

13. DX 34.

14. NLC Revenue Projections 2001–2002, Tab 2. Qwest ultimately did not adopt or implement this proposal.

15. Id.

16. DX 36.

17. DX 37. Qwest did not decide to proceed in the 30–45 days referred to in Norris's email, and Qwest did not deploy in 2002.

months]. Those put rights would have, in effect, required Motorola to guarantee a return on their investment to the third-party investors."[18]

- Next Level rejected the other term sheets it was provided because they were all "fairly toxic."[19]

When Next Level presented the Cavallo proposal to Severns, Next Level also said that "[Next Level] is within months of an announcement by a major Telco; Qwest and Bell Canada poised to deploy large scale roll-out of [Next Level] product in 2002; Qwest decision should be made public in next 45 days."[20] Shortly thereafter, on November 12, Norris sent an update concerning the two leading financing proposals (including Cavallo), and representing that "Bell Canada and Telenor have confirmed their intent to rollout in 2002."[21] On November 14, Norris notified Breen and Severns that he considered it "unlikely" that Qwest would delay deployment, but that even without Qwest Next Level's 2002 revenues "would be $100–120 million."[22]

On November 22, Norris signed the Cavallo term sheet. Norris said this action was required because "timing is critical in closing this transaction. As you know, Qwest's investor conference is scheduled for December 13, and we feel we need to have this closed before then."[23] On December 10, Severns told Next Level that

Motorola would "not agree to the Cavallo 'contingent back stop guarantee.'"[24] That same day, Severns received a call from Next Level director Paul Latchford, who informed Severns that John DeFeo of Incepta was looking into forming an "investment club" with Bechtel and GE Capital. The discussions with Incepta continued for the next five months. As part of these discussions, Severns said that Motorola was prepared to work with third parties to secure financing for Next Level. In particular, Motorola:

> would look forward to a partnership with Incepta, Fremont and GE Capital for the next round of financing.... Our major concern with your proposed terms is the 'Motorola backstop'. As proposed, the new investors would have all/most of the upside potentially while totally protected by Motorola on any downside ... *However, understanding your concerns–and hoping we can develop a partnership–we would be willing to offer a cash Motorola backstop ... for up to 25% of your investment.*[25]

While discussions with Incepta continued, Motorola met Next Level's immediate funding needs. For example, on December 10, 2001, Next Level proposed that Motorola provide an additional $20 million in financing. Motorola agreed to this on December 11.

**18.** DX 3 at 5.

**19.** DX 103.

**20.** DX 41. Qwest did not announce a rollout of Next Level products within 45 days, nor did Qwest or Bell Canada deploy a large-scale rollout in 2002.

**21.** DX 42.

**22.** PX 85. Qwest did not deploy in 2002. Next Level's actual revenues for 2002 were $57.4 million.

**23.** *Id.* On November 19, Norris also told another Motorola executive, Jerry Roseland, that "Qwest is expected to announce a $350 million, 3 city rollout on December 13 that would provide $100 million in business next year, and about $200 million the following year." DX 44.

**24.** DX 39.

**25.** DX 40 (emphasis added).

Meanwhile, Qwest failed to announce a rollout of Next Level's technology at its December 13 meeting. In response, Norris wrote to Severns and Breen regarding Motorola's further financing of Next Level:

> Qwest ... will deploy in 2[nd] half 2002.... I expect to commercialize Bell Canada and Telenor in 2002.... The new organization structure and cuts allows us to be profitable in the 4[th] quarter ... need between $60–70 million to become profitable.... [Motorola's] exposure is now capped. Once we achieve [break even], the benefits will finally accrue to Motorola....[26]

On December 27, Norris again corresponded with Severns and Breen:

> [W]ithout Motorola's support, it will be difficult to get reasonable financing now ... at least not without very toxic terms.... Chris [an Executive Vice President at Qwest] will call [Breen] ... [to] confirm Qwest's intentions to rollout.... We need only $70 million to get through [break even]. There is increasing interest in our system and products (even beyond Qwest) ... Bell South, Urban, Cincinnati Bell, and Century to name a few[ ]. I also believe Qwest will rollout in a big way in the second half. So let's get this last financing deal behind us, in whatever form, so the team can focus on growing the business.[27]

Qwest did not rollout in 2002, nor has Next Level announced large agreements with Bell South, Urban, Century, or Cincinnati Bell. Finally, on February 21, 2002, Motorola purchased $30 million in preferred stock from Next Level.

Approximately two weeks after Motorola made its preferred stock purchase, Norris and Ide told Severns and Breen that Next Level's auditors, Deloitte & Touche, were proposing to issue a "going concern" qualification on its audit report of Next Level's financial statements. In his email, Norris told Severns that:

> [I] don't have a good feeling [Incepta] will come through in time.... Our plan is ... [i]f Incepta doesn't invest, ask Motorola to provide $20 [million] and a written guarantee for further cash requirements in 2002 up to $40 [million].... In reality, I believe we can keep cash requirements between $20 [million]–$30 [million] for 2002, no matter what the revenue number.[28]

Motorola agreed to provide a $20 million guarantee to Incepta. Norris then asked Motorola to provide the entire contemplated financing. On March 19, Norris wrote to Breen and Severns that because Next Level was struggling to procure third-party financing, Norris's "Bottom line [was]: We need $15–20 million in cash plus a bridge for the remainder ... to get a clean opinion from Deloitte & Touche."[29] In the same email, Norris said that Next Level was "turning the corner," and that "Qwest ... remain[s] on track to roll out in the fourth quarter."[30] On March 20, Ide wrote to Severns asking Motorola to provide Next Level with a $35 million equity line of credit. On March 29, 2002, Motorola extended Next Level a $35 million financing

---

26. DX 47. Qwest did not expand deployment in 2002, nor did Bell Canada or Telenor commercialize Next Level's technology in any significant respect. Next Level did not break even in 2002. It lost $78.5 million.

27. DX 48.

28. DX 51.

29. DX 54.

30. *Id.* Qwest did not rollout Next Level's technology during the fourth quarter of 2002.

commitment (the "March 2002 Financing Facility").

On April 10, Norris told Breen and Severns that Next Level had received a warning letter from NASDAQ regarding their listing eligibility. In response, Next Level asked Motorola to waive certain redemption rights it had obtained when Motorola purchased its $30 million of Next Level preferred stock. While Motorola was considering this request, Next Level provided an update to Motorola that stated:

> Qwest Status . . . VDSL rollout remains slow but on schedule. . . . Qwest committed to [Next Level's] access platform. . . . Bell South Prognosis: High confidence in acquiring some MDU & FTTC business in 2002. . . . Verizon Prognosis . . . Medium confidence for niche business (MDU) in 2003. . . . Bell Canada/MTS Prognosis: Excellent: Commercial roll-out of BSAM/998 to both BC and MTS in 2002. . . . Telenor Prognosis: Excellent: Q4 Roll-out anticipated. . . .[31]

On April 22, Motorola provided a letter to NASDAQ agreeing that Motorola would waive certain preferred share rights.

In May 2002, Next Level requested Motorola to permit a premature draw down on the March 2002 Financing Facility. On June 10, Motorola and Next Level executed a Securities Purchase Agreement whereby Motorola purchased an additional $33 million in Next Level preferred stock.

### D. Motorola's Decision To Commence A Tender Offer

#### 1. August 2002

In August 2002, Motorola's senior executive team began to consider strategic alternatives for Next Level, including consideration of whether to purchase the remaining publicly held shares of Next Level. Motorola's consideration of strategic alternatives, however, was not unique to Next Level. In July 2002, incoming Motorola President Mike Zafirovski initiated a series of reviews of various Motorola businesses and investments. By this time Motorola had laid off 55,000 people and was recovering from six consecutive losing quarters. The Global Strategy & Development Group, headed by Leif Soderberg, conducted these reviews.

On August 16, 2002, as part of Next Level's effort to obtain further financing from Motorola, Ide sent a business update and a financial restructuring proposal to Don McLellan, Motorola's Director of Corporate Development.[32] Highlights of this presentation include:

- A list of Net Level's "Tier 1 Accounts," including a description of each account and the products being sold, and an update on the status of the account and its revenue potential;

- Next Level's "current outlook" was that its cash flow "gets [Next Level] through 2002 and into Q1 of 2003;"

- "[Next Level] would like to pursue [venture capital] financing and potential strategic M & A to address 2003 and beyond," but that "Motorola debt restructuring is a prerequisite;"

- Next Level requested to be allowed to draw down the March 2002 Financing Facility in September and December;

---

31. DX 61. With regard to the contracts that Next Level predicted it would enter into by the end of 2002, Next Level failed to obtain large new contracts from Qwest, Bell South, Bell Canada or Telenor.

32. DX 72.

This information was then circulated among other senior executives at Motorola.

On August 29, 2002, Norris and Ide met with Galvin, Zafirovski, Devonshire, Soderberg and several members of the Global Strategy Group. At this meeting Norris and Ide provided Motorola with two PowerPoint presentations: (1) a Business Overview and (2) a Financial Overview. The Business Overview contained a discussion, among other things, of Next Level's background and environment, an evaluation of the Regional Bell Operating Companies ("RBOCs"), Next Level's assessment of its North American and worldwide opportunities, Next Level's 2002 focus, and Next Level's key accounts and opportunities. The Financial Overview contained, among other things, trend results and forecasts of key customer sales and profitability.

Also at this meeting, Next Level told Motorola that "Motorola Can Expect:"

> Execution on commitments; [t]ransparency openness, timely answers; [c]ontrol of costs and business in a way to achieve break-even and self-funding as quickly as possible; and concerted effort to secure 2 or more RBOC accounts by end of 2002. . . .[33]

Next Level also reiterated its request to "restructure/defer $63 million in debt 3 years, and continue to assist with NASDAQ listing."[34]

### 2. *September 2002*

On September 3, Norris sent Zafirovski a "matrix of options" regarding Motorola's investment in Next Level. This matrix contained four options:

- Status Quo—[Motorola] Continue Support. Improve [Next Level] valuation. Motorola sells down % over time.
- Status Quo—No More $ Support: Cap Motorola risk at current levels.
- [Motorola] Buy–Up Float: for Motorola to purchase the outstanding shares in Next Level it does not already own.
- Sell to 3rd Party: Get out of wireline access space. Mitigate [Next Level] investments. Difficult proposition in today's environment. Low stock price and few potential buyers.[35]

While Motorola was considering the "matrix of options," Next Level was still attempting to obtain further financing from Motorola. On September 13, McLellan spoke with Ide regarding financing and told him that Motorola had not yet made a decision. McLellan said instead that any decisions would require "a fresh consensus from the senior team."[36] On September 10, Ide attempted unsuccessfully to get further clarification from Gray Benoist, a Motorola executive recently installed by Motorola as a Next Level director.

Also on September 13, Soderberg told Norris and Ide that Motorola would be studying Next Level in detail as part of Motorola's consideration of strategic alternatives. Soderberg was provided with an updated Next Level PowerPoint presentation that contained much of the same information that was presented to Motorola in the Business Overview on August 29. That same day, Norris emailed Benoist with an update on Next Level's business. He represented the same bright future for Next Level that he had represented many times in the past:

---

**33.** PX 11. Next Level did not have any large sales to RBOCs, break even or become self-funding in 2002.

**34.** *Id.*

**35.** DX 76.

**36.** PX 16.

It's a pretty clear value proposition. "Access" will lead the turnaround in Telecom ... arguably, it is the only real growth area remaining in the industry.... The opportunity for [N]ext [L]evel is a multi-billion dollar proposition. The cost to [Motorola] is virtually nil compared to what they have put into the business to date. At most, another 35M in 2003 (in cash) to get us into 2004....[37]

Motorola senior management gave a presentation on Next Level to the Motorola board of directors at its September 17 meeting. Motorola included in the board package exact copies of certain pages taken from the presentation made by Norris and Ide to senior Motorola management on August 29. In the September 17 meeting, Motorola management identified three strategic options to the Motorola board:

- Do we acquire the remaining stake in [Next Level] we do not own and integrate [Next Level] into Motorola's broadband access business?
- Do we manage our [Next Level] investment to maximize its value so we can later sell/spin it off?
- Do we continue to assist in customer acquisition and providing medium term funding to enable [Next Level] to roll up acquisition opportunities and increase its scale?[38]

On the financing track, Ide had been pressing McLellan for a decision on part of Next Level's financing proposal–the conversion of a portion of the Motorola debt into preferred stock–so Next Level could remain in compliance with NASDAQ listing requirements. On September 26, Mo-

torola approved the debt conversion that resulted in Motorola acquiring an additional $22 million of preferred Next Level stock and Next Level avoided a NASDAQ delisting.[39]

### 3. October 2002

Motorola's business review of Next Level kicked into high gear in October. On October 9, Norris gave Soderberg another list of Next Level's key customers. Soderberg eventually gave this information to RHK, Inc., an independent review firm retained by Motorola in November 2002 to evaluate Next Level's prospects.

Also on October 9, both Needham & Co. and Credit Suisse First Boston released analyst reports on Next Level. The Needham report contains information that is similar to the information Next Level now contends was confidential and non-public. For example, the Needham report states:

- 2003 will be a year of field trials by Verizon, SBC and Bell South, followed by large deployment in 2004.
- Qwest will decide in October 2002 if it will move forward in early 2003 with a multi-city deployment.
- Bell Canada started modest volume deployment a few months ago, and will likely accelerate in 2003.
- Besides Qwest, other Tier 1 accounts in 2002 included Manitoba Telecom, Telenor and China Telecom.[40]

Meanwhile, on October 14, Next Level received another delisting notification from NASDAQ for breach of the listing requirement that a company's stock price not fall below one dollar per share for more than

37. PX 18.

38. PX 19.

39. This was paid for by $10 million draw down under the March 2002 Financing Facili-

ty, and a cancellation of $12 million in debt under the Credit Agreement.

40. DX 10.

30 days. On October 16, Norris asked Motorola to extend the Credit Agreement debt by three years to help alleviate the problem. Norris reminded Zafirovski that "for months we have asked Motorola to look at pushing out the $51M debt ... but have gotten no response."[41] Norris also noted that he was "making headway with Qwest, Bell South, MTS and BC."[42] Motorola agreed on October 21 to extend the maturity date of the Credit Agreement by three years in exchange for warrants to purchase shares of Next Level common stock at a price of $0.76 per share.

On Motorola's business review front, it held meetings during October 2002 to analyze a going private transaction with Next Level. Soderberg's team prepared an internal analysis of Next Level. This analysis was based, in part, on internal information provided to Motorola by Next Level. On October 22, J.P. Morgan Securities, Inc. ("JP Morgan") made a presentation to Motorola's senior management regarding Next Level. The proposal discussed two options: (1) an "Equity Spin–In," which is essentially a going private transaction; and (2) "Restructure/Continue to Fund."[43] On October 28, Galvin, Soderberg, Norris and Ide met to discuss Next Level's prospects. In advance of the meeting, Soderberg asked Next Level to provide specific information related to its revenue plan, its anticipated customer sales (the "sales funnel"), and information on profitability and pricing.

### 4. *November 2002*

In November 2002, Motorola retained RHK, a telecommunications consulting firm, to examine the economics and business model for Next Level's core product. RHK used a variety of information (from Motorola, Next Level and resulting from its own efforts) in developing its report for Motorola. RHK was given access to information from Next Level and conducted detailed interviews with appropriate decision-makers at each of the RBOCs.

On November 21, Next Level received another delisting notification from NAS-DAQ. At roughly the same time, Next Level was informed by its auditors at Deloitte & Touche that it may be subject to a "going concern" qualification in its audit report unless it procured $30 million in additional financing. In response to the NASDAQ letter, Next Level sought a permanent change in the terms of Motorola's preferred stock, including removing the redemption feature. A few weeks later, Motorola agreed to materially alter the terms and reduce its rights under the preferred stock.

Also on November 21, Motorola's Corporate Development Group gave a presentation to Motorola senior management related to Next Level. The presentation provided a list of additional due diligence that Motorola needed to conduct before deciding whether to commence a tender offer. Meanwhile, Norris continued to send Motorola customer information and revenue projections.

On the financing track, Next Level continued trying to secure third-party financing. Motorola approved. Next Level contacted Raymond James Associates, Inc. in November 2002 about exploring third-party sources of capital. Ide kept McLellan fully informed about his discussions with Raymond James.

### 5. *December 2002*

In December 2002 Motorola completed its due diligence evaluation of Next Level

---

**41.** DX 81.

**42.** *Id.*

**43.** PX 36.

and began making preparations for a tender offer. On December 2, Norris provided Soderberg and McLellan with a presentation that updated Next Level's "sales funnel" and the status of its key customers. As part of this update Norris again attempted to convince Motorola that Next Level is "at a crossroads" with respect to improving sales.[44]

On December 5, with Norris's proposal to restructure Next Level's debt in order to avoid NASDAQ delisting still under consideration, Norris asked Motorola to allow Next Level to obtain $30 million in third-party financing "before we file our 10–K at the end of March."[45] Norris's request again came with promises of imminent sales and improving prospects:

> It is absolutely critical, at this juncture, that NASDAQ not be an issue with our customers. Our customers equate our listing status with liquidity and survivability. At least five potential customers are presently in the process of making significant purchasing decisions regarding Next Level's platform.[46]

On December 6 and 9, Norris again corresponded with Motorola about imminent revenue prospects. In an email to Galvin, Norris reported on an "off the record call this morning from a friend [at one of Next Level's customers regarding a very large potential order]. Bottom line, we are winning but–[one of Next Level's competitors] is poisoning the well with concerns about Next Level's financing."[47]

On December 6, JP Morgan provided Motorola with a presentation entitled "Mi-

nority Buy–In Discussion Materials."[48] JP Morgan discussed the two basic options for a squeeze-out transaction: a negotiated merger or a tender offer followed by a short-form merger. JP Morgan described the *Siliconix*[49] decision, and recommended that Motorola proceed with a *Siliconix*-style squeeze-out transaction.

On December 10, Next Level again provided Motorola with updated information relating to Next Level's "product road map," product cost goals, and its future prospects.[50] On December 11, Ide briefed executives at Motorola on Next Level's financial situation and developments regarding Next Level's key customers. On December 12, Norris emailed Motorola again with another update of Next Level's rollout plans, milestones, and potential sales to two large Next Level customers. In another email to Motorola on December 12, Norris stated, "I believe 2003 will mark the beginning of the turnaround for our business.... Jim Ide and I are working on a plan that will get us to break even...."[51]

On December 13, RHK provided Motorola with a 16–page report titled "Next Level VDSL Opportunity Assessment."[52] RHK confirmed in its presentation that it had used information provided by Next Level when developing its assessment.

On December 16, 2002, Motorola's Corporate Strategy and Development Group considered a lengthy presentation regarding Next Level. The presentation began with the team's recommendation that "Mo-

44. PX 50.

45. DX 86.

46. *Id.*

47. PX 51.

48. PX 53.

49. *In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787 (Del.Ch. June 21, 2001).

50. PX 57.

51. PX 59.

52. PX 60.

torola should acquire the remaining shares of [Next Level]."[53] The report cautioned that more detailed reports would be developed "after further due diligence."[54] During the meeting, McLellan warned Galvin, Zafirovski and Devonshire that Motorola possessed "inside information" about Next Level that could affect when Motorola could launch the tender offer.[55] McLellan did not believe, however, that Motorola's only choice was to disclose the information or not engage in a tender offer. He was only noting that, "[Next Level] intends to have a succession of 6–8 press releases after the first of the year with customer and product announcements–getting this information out first will ease our disclosure burden."[56] Thus, McLellan was primarily concerned with the timing of the tender offer.

### 6. January 2003

On January 2, 2003, Norris emailed Galvin, and Zafirovski with another "Next level update."[57] Norris again provided updated revenue projections for 2003 and identified certain cost-cutting measures. On January 6, less than one week before Motorola would launch its tender offer, Motorola asked for and received an updated 2003 sales forecast for Next Level. '

On January 8, 2003 Ide advised McLellan that Next Level was finalizing the engagement of Raymond James for third-party financing. Ide asked if Motorola would provide short-term bridge financing until the completion of the third-party financing. Motorola did not respond. Later on January 8, Ide advised Benoist that Raymond James would be retained on January 10, 2003, and would start the fundraising process. Benoist did not respond.

On January 9, Motorola's review team and JP Morgan had a meeting with Motorola's senior management to present its recommendation to proceed with a tender offer. Also on January 9, Motorola senior management presented to the board of directors its recommendation to proceed with the tender offer. Motorola made its final determination to proceed and set an offer price on January 11.

### D. Announcement Of The Tender Offer

On January 12, 2003, McLellan sent a letter to Norris announcing Motorola's intention to commence a tender offer for all of the outstanding common stock of Next Level for $1.04 cash. McLellan also called Norris to notify him. The following day, Motorola issued a press release regarding the offer. Next Level then formed an independent committee of directors (the "Independent Committee") to evaluate the tender offer. On January 25, Next Level's Independent Committee sent Motorola Chairman Paul Latchford a letter expressing concern over possible confidential disclosures Motorola might make in its Offer to Purchase. Latchford wanted the opportunity to review Motorola's Offer to Purchase before it was distributed to Next Level's stockholders. Motorola never responded to Latchford's request, and he was not able to review the Offer to Purchase before it was sent out. In any event, there currently is no claim that Motorola improperly disclosed confidential information in its Schedule TO or Offer to Purchase.

### E. Motorola's Schedule TO

On January 27, Motorola formally commenced its tender offer (the "Tender Of-

---

53. Id.

54. Id.

55. PX 62.

56. Id.

57. PX 67.

fer") by filing its Schedule TO with the Securities and Exchange Commission.[58] The Schedule TO and the Offer to Purchase sent to Next Level stockholders contain comprehensive disclosures concerning Motorola's evaluative process, including (1) Motorola's independent financial analysis and projections of Next Level's revenues; (2) a discussion of Next Level's products and industry, and Motorola's assessment of the same, (3) the RHK report, (4) Norris's views and criticisms of the RHK report, (5) a detailed summary report prepared by JP Morgan for Motorola's management, and (6) summary financial statements as required by the SEC. The Tender Offer is expressly conditioned on a majority of the minority stockholders tendering, and commits Motorola to complete a short-form merger pursuant to 8 *Del. C.* § 253 if the tender offer succeeds.

Not only did Motorola disclose the projections upon which it relied in making its offer, it also disclosed Next Level management's significantly higher projections. Finally, Motorola set forth the economic factors–including its perception of market conditions and market trends–that cause it to believe that its projections are realistic and that the projections of Next Level's management are unlikely to be realized.[59]

F. *The Independent Committee Requests Certain Assurances; Motorola Responds*

Next Level's Independent Committee then sent Motorola a letter on January 28 requesting certain assurances that Motorola would, among other things, "offer unqualified support of [Next Level] with re-

spect to its attempt to secure third party financing," continue to finance the implementation of Next Level's business plan, and agree to vote in favor of a stock split in order to maintain Next Level's listing on NASDAQ.[60]

Motorola responded to this request for assurances by letter dated January 30. With respect to Next Level's request for continued funding, Motorola stated that "if the tender offer is not successful, Motorola will consider in good faith all other reasonable options, including third party financing proposals."[61] Motorola made no response to the Independent Committee's request for support of Next Level's efforts to maintain its NASDAQ listing through a reverse stock split.

On February 4, Next Level simultaneously filed its Schedule 14D–9 Solicitation and Recommendation Statement with the SEC and the complaint in the present case. Next Level's 14D–9 clearly articulates its attitudes and views regarding its believed inadequacy of Motorola's tender offer. Specifically, Next Level has stated:

> The Next Level Board believes that the Motorola Offer significantly undervalues Next Level's long-term prospects.... The Next Level Board believes that Next Level's continuing progress with the [RBOCs] and other major North American telecommunications service providers could result in significantly increased revenues and operating performance. Next Level's achievement of its financial projections throughout the past year also gives the Next Level Board increased confidence in Next Level's abilities to achieve its future financial projections.[62]

---

**58.** DX 3.

**59.** *See id.* at v; 9; 16–17; 26.

**60.** DX 97.

**61.** DX 98.

**62.** *Id.* at 9. Next Level also reported that it has "exceeded or come within the range of its publicly disclosed revenue projections for

In addition, Next Level disclosed that its "December 31, 2002 backlog increased to $7.9 million from $2.8 million at September 30, 2002."[63] Finally, Next Level provided its own set of projections in its Schedule 14D-9, which are materially more optimistic than those given to Motorola in December 2002.

## III.

■■■ A preliminary injunction is an extraordinary form of relief that will be granted only where a party demonstrates: (1) a reasonable probability of success on the merits at a final hearing; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable harm; and (3) that the harm to the plaintiffs if relief is denied will outweigh the harm to the defendants if relief is granted.[64] The extraordinary remedy "is granted only sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently."[65] Moreover, this court has held repeatedly that in the absence of a competing offer a plaintiff seeking to enjoin a premium transaction for a corporation's shares must make a particularly strong showing on the merits to obtain a preliminary injunction because an injunction in such circumstances risks significant injury to shareholders.[66]

## IV.

A. *Next Level Has Failed To Establish A Reasonable Probability Of Success On The Merits Of Its Claims*

■■ In analyzing the situation presented by the Tender Offer, the court will apply the framework of analysis utilized in a series of recent decisions of this court and most recently discussed in the *Pure Resources* case.[67] Those decisions are

each of the last four quarters." *Id.* It is unclear to this court whether Next Level has ever met its projections during the last year. In fact, in February 2002, Next Level projected 2002 annual revenues to be $150 million. Next Level's actual 2002 revenues were approximately $57 million. Similarly, in September 2002, Next Level projected fourth quarter 2002 revenues as $22 million. Actual revenues for that period were approximately $14 million.

63. *Id.*

64. *See, e.g., SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 40 (Del.1998); *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del.1986); *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 694, 698 (Del.Ch. 1986); *see also In re IXC Communications, Inc. S'holders Litig.*, 1999 WL 1009174, at *4 (Del.Ch. Oct.27, 1999) (stating "[t]his [preliminary injunctive] relief is extraordinary and the test is stringent").

65. *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del.Ch.1998).

66. *See, e.g., McMillan v. Intercargo Corp.*, 1999 WL 288128, at *5 (Del.Ch. May 3, 1999)

(" '[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of an untoward financial result from the stockholders' point of view is small.' ") (quoting *Solash v. The Telex Corp.*, 1988 WL 3587 at *13 (Del.Ch., Jan.19, 1988)); *Kohls v. Duthie*, 765 A.2d 1274, 1289 (Del.Ch.2000) ("This court is understandably cautious when the issuance of an injunction 'would deprive ... shareholders of the benefits of [a] merger transaction without offering them any realistic prospect of a superior alternative, or for that matter, any alternative.' ") (quoting *In re Wheelabrator Tech., Inc. S'holders Litig.*, 1990 WL 131351 at *8 (Del.Ch., Sept. 6, 1990)).

67. *In re Pure Resources S'holders Litig.*, 808 A.2d 421, 433–46 (Del.Ch.2002); *In re Aquila Inc. S'holders Litig.*, 805 A.2d 184 (Del.Ch. 2002); *In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787 (Del.Ch. June 19, 2001).

predicated on the holding of the Delaware Supreme Court in *Solomon v. Pathe Communications Corp.* that "Delaware law does not impose a duty of entire fairness on controlling stockholders making a non-coercive tender or exchange offer to acquire shares directly from the minority holders."[68] In place of an entire fairness standard, these cases examine both the structure of the transaction to insure that it is voluntary in nature and information disclosed to insure its adequacy and completeness. Where an offer is found to be both structurally non-coercive and fully disclosed, the court has left the decision whether to tender or not up to the stockholders.[69]

■ Motorola's offer is (i) inalterably conditioned on its acceptance by holders of a majority of the minority-owned shares (the "Minimum Tender Condition"),[70] (ii) subject to a waivable condition that Motorola's share ownership exceed 90% of the issued and outstanding Next Level common shares as a result of the offer (the "90% Condition"), and (iii) accompanied by appropriate assurances that, if the Tender Offer is completed, Motorola will effect a short form merger, pursuant to 8 *Del. C.* § 253, to eliminate the non-tendered shares (other than those seeking appraisal) for the same cash consideration.[71] These elements of the Tender Offer fully satisfy the model for structural non-coercion, applied in *Aquila* and explicated in *Pure Resources*.

There is also no question here, as there was in each of *Siliconix; Aquila,* and *Pure Resources,* about the ability of the target company board of directors to respond to the Tender Offer free of parent company influence. In this case, somewhat unusually, a majority of Next Level's directors are not associated with Motorola. Thus, following news of the Motorola proposal, Next Level's board of directors formed the Independent Committee, excluding from its membership both the two Motorola designees and management rep-

---

**68.** 672 A.2d 35, 39 (Del.1996) (citations and quotations omitted).

**69.** The question of whether or not the decision of the Delaware Supreme Court in *Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110 (Del.1994), requires the application of the entire fairness standard of review to the facts of this case was never presented by Next Level or the other plaintiffs in connection with this motion. Rather, they chose to "preserve" that issue for later consideration by this court "and/or a possible appeal to the Supreme Court." Next Level Op. Br. at 44 n. 4.

**70.** Next Level half-heartedly argues, in its opening brief, that the Minimum Tender Condition is improperly formulated because it excludes the management of Next Level from the definition of the "minority." Apart from the fact that the court in *Pure Resources* expressly required that the offer there *exclude* that same class of persons, 808 A.2d at 446–47, the argument is of no practical consequence, as the management and directors of Next Level as a group hold an entirely *de minimus* amount of Next Level stock.

**71.** In this case, the 90% Condition is of decidedly secondary importance due to Motorola's ownership of a large number of warrants and convertible securities. As reported in the Offer to Purchase, "[e]ven if Motorola waives the 90% Condition, Motorola has currently exercisable warrants and preferred stock conversion rights that, if exercised, are sufficient for Motorola to own 90% of the Shares following consummation of the Offer so long as the Minimum Tender Condition is satisfied. Motorola will not consummate the Offer following waiver of the 90% Condition unless it intends promptly thereafter to exercise warrants of preferred stock conversion rights sufficient for it to own 90% of the shares and to consummate the Merger described below." DX 3 at 1. Thus, if the tender offer is consummated, Motorola will have the unilaterally exercisable power, pursuant to 8 *Del. C.* § 253, to effect the short form merger and will do so.

resentatives, and delegated to that committee the responsibility of responding to the announced Tender Offer, including the preparation of the Schedule 14D–9. The Independent Committee retained legal and financial advisers and has taken an active role in responding to the Tender Offer. On February 3, 2003, the Independent Committee and the Next Level board met together (the Motorola designees not participating) and determined to recommend that Next Level shareholders not tender their shares. At the same time, they authorized Next Level's lawyers to file this lawsuit for the purpose of enjoining the Motorola Tender Offer.

Because the Tender Offer is not structurally coercive and the Next Level board of directors is manifestly able to communicate its views about the Tender Offer to Next Level stockholders, what remains to be considered is whether the disclosures found in (or omitted from) the Offer to Purchase likely violate Motorola's fiduciary duty of full and fair disclosure. Next Level advances two general arguments why they do. First, it argues that the Offer to Purchase is false and misleading because it omits to disclose all of the confidential customer and other financial information that Next Level furnished to Motorola (or to RHK) in connection with its due diligence process. Second, it argues that statements relating to the conduct of Next Level's business in the event the Tender Offer does not succeed amount to actionable threats of retribution that leave Next Level stockholders no choice but to tender

their shares, notwithstanding the Next Level board's contrary recommendation. The court will address these arguments in turn.

### 1. *Disclosure Issues*

■ The focus of Next Level's multi-pronged attack is on the disclosures made by Motorola in its Offer to Purchase. According to Next Level, during the course of due diligence, Motorola received from Next Level and relied upon a significant amount of non-public information (especially about Next Level's immediate sales prospects) that Motorola is prevented from disclosing by both contractual and fiduciary duties. Since this information is both highly material and confidential, the argument goes, Motorola cannot legally proceed with the Tender Offer, under the familiar "disclose or abstain" rule derived from *SEC v. Texas Gulf Sulphur Co.*[72]

The court will pass over the contention that Motorola is under either a contractual or fiduciary duty to refrain from disclosing Next Level's confidential or proprietary information. Next Level points to four separate sources of such a duty, but it only argues for the application of that duty with respect to information that Motorola *has not disclosed.* Because the record at this stage of the proceeding shows that Motorola need not disclose the additional information at issue, there is no occasion to consider whether some duty *not* to disclose that information actually exists.

---

**72.** 401 F.2d 833, 848 (2d Cir.1968) ("[A]nyone in possession of material insider information must either disclose it to the investing public or if he is disabled from disclosing it in order to protect a corporate confidence ... must abstain from trading ...."). This principle has, of course, found application in the case of tender offers. *See, e.g., Burlington Indus., Inc. v. Edelman,* 666 F.Supp. 799, 820 (M.D.N.C.1987) (enjoining tender offer where

bidder had a duty to target company not to disclose its material information in bidder's possession); *Essex Chem. Corp., v. Gutir–Hebelein AG,* 1988 U.S. Dist. Lexis 16708. at *2–3 (D.N.J. June 24, 1988) (ORDER), *aff'd,* 857 F.2d 1463 (3d Cir.1988) (preliminarily enjoining tender offer pending determination of whether a confidentiality agreement barred disclosure of target information).

Thus, the question is whether the information Motorola has *not* disclosed is material to the stockholders' decision to tender. The court will analyze that question in the familiar framework of Delaware law that requires Motorola, as a majority stockholder, to disclose all material facts bearing on a stockholder's decision whether or not to tender.[73] In this context, Delaware courts apply the objective materiality standard articulated by the United States Supreme Court in *TSC Industries, Inc. v. Northway,*[74] as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[75]

The information at issue is found in the so-called "sales funnel" presentations or in similar communications about the prospects for Next Level's near term sales revenues. The information relates, in general, to developments in Next Level's efforts to achieve substantial revenues from the RBOCs (including Qwest, its largest customer), and other domestic and international telecommunications firms. In addition, according to a demonstrative exhibit provided to the court at oral argument, Next Level contends that Motorola has a detailed 2003 customer-by-customer revenue forecast that must be disclosed. And, according to the same exhibit, Motorola knows undisclosed information about the expectations of Next Level's management regarding when Next Level will break even.

There are several reasons why Motorola is not required to disclose the information at issue.

First, Motorola's Offer to Purchase already discloses a large amount of forward looking information that incorporates and reflects a variety of assessments of near term prospects for both the telecommunications equipment industry, in general, and Next Level, in particular. Among other things, the Offer to Purchase discloses Motorola's projections for Next Level's operations in 2003 and 2004, explains the assumptions used in preparing those projections, and presents a summary of the major variables and results for the three cases described in those projections ("low case," "base case," and "high case"). Next Level does not challenge any of these disclosures, nor does it complain (with one no longer material exception[76]) that the Offer to Purchase fails to fairly and accurately disclose its historic financial performance. Moreover, Next Level does not contend

---

73. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

74. 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

75. *Id.*

76. Next Level does correctly point out that, on page 3, the Offer to Purchase materially misstates the amount of its per share loss for the first 9 months of 2002. The correct figure is reported at page 36 of the Offer to Purchase. Motorola has informed the court that it will file and disseminate an amendment to its Offer to Purchase that corrects this misstatement.

that the projections prepared by Motorola were not prepared in good faith, *i.e.,* that they do not reflect Motorola's honest assessment of Next Level's near term outlook.[77] In the circumstances, the court is unable to agree that Motorola should be required to disclose the raw data or input that underlies the projections it prepared and disclosed. That function is served by the disclosure, already made, about the assumptions on which it relied in preparing those projections.[78]

In this connection, the court notes that Motorola's Offer to Purchase also discloses two more optimistic sets of 2003 financial projections prepared by Next Level management (dated August 2002 and December 2002) and discusses the differences between the projections prepared by Next Level management and those prepared by Motorola. In particular, the Offer to Purchase discloses Motorola's disagreement with the "high case" presented in the Next Level projections that apparently reflects Next Level management's assessment of the very sort of "soft" information at issue here. As to that "high case," the Offer to Purchase states, as follows:

Motorola does not believe that the high cases included in the August and December 2002 projections are reasonably possible, as they would require a 300%

increase in revenues over expected 2002 results. Motorola also believes that the base case presented by Next Level may be difficult to achieve.[79]

As is explained in the Offer to Purchase, the decision to discount the likelihood of a 300% increase in revenue was, itself, based on a detailed analysis of the marketplace, including interviews with Next Level's customers by RHK. Taken together, the disclosures in the Offer to Purchase appear to provide stockholders with a fully adequate basis to judge Motorola's expectations for Next Level's future performance.

Second, the record strongly supports a conclusion that the type of information that Next Level argues Motorola must disclose is itself substantially unreliable and poorly correlated to Next Level's actual future financial performance. As is discussed in detail in Section II, *supra,* Motorola has a long and costly experience involving very much the same kind of highly optimistic forecasting by Next Level's management (and, in particular, Norris) about impending large customer orders or imminent turnarounds in financial performance that have invariably proven to be incorrect. Nothing in our case law supports a conclusion that such highly speculative and unreliable information is materi-

---

**77.** At oral argument, the Next Level's counsel specifically confirmed that his client was not challenging the good faith preparation of Motorola's projections.

**78.** *See, e.g.,* 15 U.S.C.A. § 78u–5(c). This section was added to the Securities Exchange Act as part of the Private Securities Litigation Reform Act of 1995, and provides a safe harbor for forward-looking statements made by public companies. A forward-looking statement, such as a projection, must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" in order to fall within this statutory safe harbor. In this case, Motorola's disclosures regarding its as-

sumptions used in deriving its projections for Next Level satisfy the SEC's guideline, and similarly satisfy this court. *See also In re Siliconix Inc. S'holders Litig.,* 2001 WL 716787 at *10 (noting that although "bare bones" projections for the target company were provided in the context of a tender offer, there was "not a 'substantial likelihood' that the details and assumptions underlying the projections 'would significantly alter the total mix of information already provided' to the shareholders") (quoting *Skeen v. Jo-Ann Stores, Inc., et al.,* 750 A.2d 1170, 1174 (Del. 2000)).

**79.** DX 3 at 19.

al to a stockholder's decision making or that a fiduciary is required to disclose it.[80] Here, that result is especially compelling, since there is no contention that the projections disclosed in the Offer to Purchase were prepared in bad faith or understate Motorola's honestly held views about Next Level's future financial prospects. Under all the circumstances, Motorola's disclosure of its projections and the assumptions on which it made them is best understood to reflect both the information about which Next Level complains and Motorola's evaluation of it.[81]

Next Level also argues that Motorola failed to disclose material aspects of its due diligence process. Specifically, Next Level alleges that Motorola "relied extensively upon non-public, confidential information in formulating and proceeding with the Tender Offer," including: Next Level's revenue plan, "sales funnel," customer milestones, customer information, and product information.[82] Motorola has, however, disclosed that it possessed and utilized much of this information either directly or indirectly. In particular, Motorola disclosed in the Offer to Purchase that it engaged in a five-month review of Next Level, which included, among other things, "a review of Next Level's financial statements and balance sheet structure and creation of a financial model showing the outlook for Next Level using projected base, high and low revenue scenarios."[83] Moreover, Motorola disclosed that it derived its set of projections from Next Level's own internal projections.[84] Finally, in its disclosure regarding the work RHK performed, Motorola disclosed that RHK based its report on:

a review and analysis of information available from Next Level (including product documentation, market strategy and technology documents, a presentation on historical market acceptance of Next Level's product offerings, current financial projections, a financial model used to assess decision economics for a potential carrier customer and interviews with Next Level marketing personnel).[85]

After RHK completed its review, the results were shared with Norris, and he provided additional comments to Motorola. This too was disclosed by Motorola in the Offer to Purchase.[86]

All of this leaves the court with the firm conviction that Next Level has failed

---

80. In its briefs and at argument, Next Level relies heavily on the opinion in *Essex Chem. Corp.* for the proposition that disclosure of the "soft" information in Motorola's possession is required. In that case, two factors not present here, appear to have led the court to enter an injunction. First, the bidder did not disclose either its projections of future financial performance or those prepared by the target company management. Second, the court's *in camera* inspection of undisclosed documents revealed "dramatic financial facts and projections ... based on hard facts." C.A. 88–2478, slip op. at 17–18 (D.N.J. June 24, 1988). In contrast, the Offer to Purchase discloses both Motorola's projections and those prepared by Next Level management; moreover, the "dramatic" information in this record is neither reliable nor based on "hard facts."

81. Indeed, if the court were to require Motorola to disclose the sort of highly unreliable "soft" information at issue here, Motorola would also, no doubt, need to disclose its reasons for discounting that information, including the litany of similar predictions made by Next Level's management over the years that proved to be wrong.

82. Next Level Op. Br. at 56–58.

83. DX 3 at 16.

84. *Id.* at 17.

85. *Id.* at 20.

86. *Id.* at 21.

to meet its burden of showing a reasonable likelihood of success on the merits of the argument that the omitted information is material, *i.e.*, that there exists "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder."[87]

 In reaching this conclusion, the court has considered and rejects Next Level's argument that *Weinberger v. UOP, Inc.*[88] requires a different result. Perhaps most obviously, Motorola has chosen to pursue a voluntary transaction in which a majority of Next Level's minority stockholders are free to accept or reject Motorola's proposal. In *Weinberger*, by contrast, Signal Companies, Inc., the parent corporation, sought to squeeze-out the minority in a merger in which its majority shareholding was able to determine the outcome of the vote. Thus, the Delaware Supreme Court held that Signal was subject to a fiduciary duty of entire fairness in pursuing that transaction. Moreover, unlike Signal, Motorola (i) does not control a majority of the subsidiary board of directors, (ii) did not cause either of its board representatives (or, for that matter, anyone else) to engage in a secret process of gathering and analyzing non-public information of the subsidiary, and (iii) has not concealed from the subsidiary's board of directors or stockholders the fruits of the studies it did undertake.[89] In the circumstances, *Weinberger* provides scant support for the requested injunction.[90]

---

87. *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. 2126.

88. 457 A.2d 701 (Del.1983).

89. The court has also considered and rejects Next Level's argument that seeks to analogize between the famous "Arledge/Chitiea Report," at the center of the dispute in *Weinberger*, at 708–12, and a four-line email message from a Motorola analyst that refers to a "reservation price" in a range in excess of $1.04 per share. PX 91. Next Level, naturally, argues that Motorola should have to disclose the information in this email about its "reservation price," just as Signal had to disclose the fact that the Arledge/Chitiea Report recommended that a price up to $3 per share more than the price paid in the merger would be a "good deal" for Signal. As became clear at oral argument, however, there is simply no factual record at this stage of the proceeding to support any inference about the significance of the information reflected in PX 91. In particular, there is no suggestion in the record that the information in that email has anything to do with Motorola's pricing of the Tender Offer or reflects a range of values that anyone at Motorola with authority ever considered in connection with that transaction. Indeed, the only witness who was shown the document at deposition was unfamiliar with it. Moreover, as this court held in *Pure Resources*, a person making a tender offer is not ordinarily required to disclose its "reserve price." 808 A.2d at 451.

90. As a fallback to its disclosure claims, Next Level argues that Motorola's offer is "substantively coercive" because the stockholders are being asked to tender shares in "ignorance or mistaken belief" as to the value of the shares. *See* Next Level Op. Br. at 48. The doctrine of substantive coercion provides that a board may consider a premium tender offer a threat where "the board believes that the company's present strategic plan will deliver more value than the premium offer, the stock market has not yet bought that rationale, the board may be correct, and therefore there is a risk that 'stockholders might tender ... in ignorance or based upon a mistaken belief....'" *Chesapeake Corp. v. Shore*, 771 A.2d 293, 324 (Del. Ch.2000) (citations omitted). This doctrine has been viewed with some skepticism. See, *e.g., id.* at 324–29. In any event, the court finds no substantive coercion in the Tender Offer primarily for the same reasons that it finds no disclosure violation. All of the information needed for a stockholder to evaluate Next Level's prospects and value is included in Motorola's Offer to Purchase. Further, much of Next Level's "confidential information" regarding imminent sales has since been disclosed to stockholders by Norris at Next Level's February 4, 2003 conference call to analysts. *See* DX 99. All of this information presumably has been incorporated into the current stock price of Next Level.

### 2. Does Motorola's Offer To Purchase Threaten Retributive Action?

Next Level makes a series of arguments to the effect that Motorola's Offer to Purchase contains statements that inequitably coerce Next Level stockholders into tendering. These arguments are all keyed off of statements in Motorola's disclosure documents to the effect that: (i) Next Level needs additional funding and will find it hard to obtain from any source other than Motorola; (ii) Next Level has been threatened with delisting from NASDAQ due to its failure to maintain compliance with certain listing requirements; and (iii) Deloitte & Touche, Next Level's independent auditors, have informed it that they will include a "going concern" qualification in the upcoming report on Next Level's 2002 operations unless an additional $30 million in financing is obtained.[91] Perhaps exceeding the reasonable bounds of zealous advocacy, Next Level's brief labels the discussion of these subjects in the Offer to Purchase as "threats" and describes them as "all the more pernicious to the minority stockholders in light of Motorola's history of advantaging itself at every opportunity to the extreme detriment of the Company and its public stockholders."[92]

#### a. The Need For Additional Funding

■ In Section 4—Purpose of the Offer; Motorola plans for Next Level; Consideration of Alternative, the Offer to Purchase discusses the economic environment of declining revenues and high operating costs in which Next Level has been operating for several years. It then reports factually that "since December 2000, [Motorola] made a series of interim financings now totaling more than $175 million, provided financial guarantees which currently support $30 million of obligations, made concessions with respect to the terms of its financings to support Next Level's listing on the Nasdaq National Market, and assisted Next Level by contacting Next Lev-

---

The court has also considered and rejects the argument that the timing of the Motorola tender offer is inequitable. First, where full disclosure is made, it is difficult to see how a corporate fiduciary engages in inequitable conduct by merely offering to purchase shares from other stockholders at a premium price, even when the market for those shares is relatively depressed. *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch.1987). Second, the evidence of record demonstrates that the timing of Motorola's tender is not related to the market price of Next Level common stock. Instead, the timing has been driven by Motorola's change in management and the overall strategic review initiated in the summer of 2002. Indeed, the record supports the conclusion that Motorola has acted consistently and at great expense to itself to maintain Next Level's NASDAQ listing, thus, preventing further erosion in Next Level's share price.

**91.** Next Level also argues that Motorola is coercing Next Level stockholders into tendering "by suggesting that Next Level may lose its key employees as a result of the Tender Offer." In its Offer to Purchase, Motorola makes the following statement:

> Motorola believes that Next Level's key employees are important to the success of Next Level's business and operations. Motorola plans to provide incentives to key Next Level employees to remain following completion of the Offer and the Merger. At this time, Motorola has not finalized any particular incentive plans, but Motorola intends to work with Next Level's management to minimize disruption to the Next Level team.

DX 3 at vi and 15. Based on this statement, Next Level makes the puzzling argument that "[b]y conspicuously withholding support of Next Level's employee retention efforts, Motorola is attempting to coerce tenders by creating a fear among the Next Level stockholders that the Company's employees will leave . . . ." Op. Br. at 47–48. Suffice it to say that the statement at issue cannot realistically be interpreted as threatening the loss of key Next Level employees.

**92.** Next Level Op. Br. at 45.

el's customers and suppliers at Next Level's request."[93] The Offer to Purchase then states, again factually, that "[c]ontinuing to provide interim support to Next Level is no longer desirable to Motorola and, in Motorola's view, will not sufficiently address Next Level's cost and scale issues."[94] Elsewhere, the Offer to Purchase informs stockholders, again accurately, that "[w]hile Next Level can seek additional outside funding to support its immediate cash requirements, outside financing has not been available on acceptable terms and Motorola has no reason to believe that this will change in the current financial market."[95] Finally, in Section 6—*Conduct of Next Level's Business if the Offer Is Not Completed*, the Offer to Purchase contains the following disclosure, the factual accuracy of which is also not seriously questioned:

> Next Level has requested that Motorola provide approximately $30 million in funding in 2003, and Motorola believes that even further financing will be required in 2004.... There is no assurance that such financing will be available from Motorola or a third party.[96]

Premised on this and related disclosures in the Offer to Purchase, Next Level argues that the Offer to Purchase "is replete with language that can only be read as threatening Next Level's public stockholders

with dire consequences if they do not tender their shares."[97]

■ This argument suffers from several fatal defects. First, the Offer to Purchase merely states (i) obvious truths about Next Level's financial condition and need for additional funding; and (ii) the truth about Motorola's decision to cease funding Next Level's operations. Generally, reports of factual matters that are neutrally stated and not threatening do not amount to wrongful coercion.[98] Moreover, the "reality of the situation" is required to be disclosed clearly and not couched in "vague or euphemistic language."[99] Here, it appears that the Offer to Purchase merely reports the obvious truth of the situation.

Second, there is no suggestion on this record that Motorola's decision to cease funding Next Level in its current business configuration was made in bad faith or, in any other way, breached a duty owed to Next Level.[100] Thus, it cannot amount to inequitable coercion for Motorola to have disclosed that decision in its Offer to Purchase. Indeed, it is undoubtedly true that Motorola had an affirmative duty, under both federal and state law, to include a disclosure about this decision in its tender offer materials. Thus, the case is easily distinguishable from *Eisenberg*, where the company affirmatively threatened to seek delisting if its self-tender offer succeed-

93. DX 3 at 12–13.

94. *Id.* at 13.

95. *Id.* at v.

96. *Id.* at 16.

97. Next Level Op. Br. at 46.

98. *Williams v. Geier*, 671 A.2d 1368, 1383 (Del.1996); *Eisenberg*, 537 A.2d at 1061–62.

99. *Williams*, 671 A.2d at 1383.

100. It appears that Motorola has no further obligation, fiduciary or otherwise, to continue to fund Next Level. A similar argument was raised and rejected in *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 1996 WL 422377 at *3 (Del.Ch. July 24, 1996) (holding that a controlling stockholder is not constrained by fiduciary duties to take steps to avoid a foreclosure sale); *see also Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *7 (Del.Ch. Oct.29, 1993) ("Controlling stockholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them").

ed.[101] For these reasons, the court sees no inequitable coercion in the Offer to Purchase's discussion of Next Level's funding requirements.

■ Next Level then argues that Motorola's disclosures became coercive when it failed to give assurances that it would relinquish its previously bargained for contractual rights in order to more easily facilitate third-party financing.[102] The factual beginning point of Next Level's legal argument is the letter sent to Motorola by the Independent Committee on January 28, 2003. In that letter, among other things, the committee requested an assurance from Motorola that it would "agree to support and take *all actions necessary* (including *without limitation*) waiver of *any* veto rights that you have to support the fundraising efforts approved by" Next Level.[103] Motorola responded the following day by stating that it was not in a position to provide assurances with respect to hypothetical situations, but that "if the tender offer is not successful, Motorola will consider in good faith all other reasonable options, including third party financing proposals."[104] Next Level then disclosed its letter and Motorola's response in its Schedule 14D–9 and now argues that Mo-

torola's response supports a claim of inequitable coercion.

While this gambit by the Independent Committee was no doubt well intentioned, there is nothing under Delaware law that requires Motorola to waive enforceable rights that it has as a holder of preferred stock or as a lender (or to provide some blanket assurance that it will do so).[105] Nor does the fact Motorola has chosen to commence a tender offer without the consent of the Next Level board of directors give rise to such an obligation.[106]

### b. *The Possibility Of Delisting By NASDAQ*

■ As is discussed above, the NASDAQ has repeatedly notified Next Level that its shares may be delisted from the NASDAQ National Market System. As recently as January 17, 2003, Next Level received notice from the NASDAQ threatening to delist its shares because of a failure to comply with the National Market's $1 minimum bid price requirement, as well as the $10 million minimum shareholder equity requirement. In its Offer to Purchase, Motorola disclosed this information as well as the fact that Next Level had "requested an oral hearing while it

---

**101.** *Eisenberg*, 537 A.2d at 1062.

**102.** The rights that Next Level wants Motorola to surrender include "clawback" provisions, *see supra* note 5, and veto rights contained in various agreements executed between Next Level and Motorola during the previous three years.

**103.** PX 82 (emphasis added).

**104.** PX 83.

**105.** *See Odyssey Partners, L.P. v. Fleming Companies*, 735 A.2d 386, 411 (Del.Ch.1999) (majority stockholder's refusal to "waive its preemptive rights [it obtained as a creditor] or to assume further obligations on behalf of [the company] without adequate compensa-

tion cannot seriously be thought to have been a breach of its fiduciary duties").

**106.** Motorola's Delaware counsel, in private correspondence to Motorola, initially expressed some reservation over the disclosure made by Motorola in response to Next Level's funding request. *See* PX 2. This correspondence does no more than articulate the concern that this area of Delaware law is still developing, and that Motorola had a certain degree of litigation exposure due to Next Level's financing problems and the timing of the Tender Offer. The court agrees that this area of the law is developing, and finds that Motorola was only obligated to consider in good faith third-party financings that came along. This is what Motorola has agreed to do. No more can be expected.

evaluates its options." The Offer to Purchase then states that "Next Level could seek to initiate a reverse stock split, which would require approval of a majority in interest of Next Level's shareholders, or move to the Nasdaq SmallCap Market...."[107]

■ It is true that equity may intervene where a controlling stockholder advises minority stockholders that it intends to cause the delisting of a company's stock in a manner that causes the minority stockholders to vote or tender their shares for reasons unrelated to the merits of the proposal before them.[108] It is not inequitable or coercive, however, to truthfully disclose the factual possibility that shares may ultimately be delisted due to the operation of some independent mechanism.[109] This is all that Motorola's Offer to Purchase did, and its disclosures cannot be seen to amount to inequitable coercion.

■ Next Level also argues that Motorola's disclosure has somehow become coercive as a result of its failure to respond to the Independent Committee's request for an assurance that, "[w]hatever the outcome of the Tender Offer, Motorola agrees to vote all shares of [Next Level] ... in favor of any stock split that the Independent Committee and the Board determine may be advisable in order to maintain a listing on any NASDAQ market."[110] Motorola's January 30, 2003 letter responding to the Independent Committee does not mention this request. From this silence, Next Level argues the court should imply a threat by Motorola that it would veto a proposal for a reverse stock split, if one is made.

It is, perhaps, surprising that Motorola did not readily agree to support a reverse stock split, since it is a non-economic transaction that would have little or no effect on Motorola's investment in Next Level. This is especially so since the cost to all Next Level stockholders–including Motorola–of a delisting could be substantial. Nevertheless, Motorola's silence on this issue in its response to the Independent Committee's request does not support an inference, by the court or Next Level stockholders, that Motorola would, in fact, exercise its voting power to block a reverse stock split if one is needed to maintain the company's listing on NASDAQ. Indeed, although the January 30 letter was silent as to this specific request, it did state that Motorola would consider in good faith requests for third-party financing which would also be needed to prevent a NASDAQ delisting.

### c. The "Going Concern" Qualification

■ The Offer to Purchase reports the following:

As noted above, Next Level, as of December 2002, was seeking an additional $30 million in funding and, in Motorola's view, will need to take other steps to avoid a "going concern" qualification from its auditors.... Motorola has not made any commitment to Next Level to provide financing or other support to Next Level in order to permit Next Level to continue operation as a going concern.... There is no assurance that such financing will be available from Motorola or a third party.[111]

Additionally, Motorola disclosed that "[o]n December 19, 2002 Next Level again

107. DX 3 at 9.

108. *See Eisenberg,* 537 A.2d at 1062.

109. *See id.; accord In re Siliconix S'holders. Litig.,* 2001 WL 716787, at *16.

110. PX 82.

111. DX 3 at 16.

requested a financing commitment from Motorola in the amount of $30 million for 2003 in anticipation of concerns that Next Level's auditors would need to include a 'going concern' qualification in Next Level's next auditor's report absent additional funding."[112]

For the reasons already discussed above, the court is unable to conclude that these statements inequitably coerce the Next Level stockholders in their tendering decision. Rather, Motorola's disclosures merely relate facts and inform the stockholders that, unless additional funding from some other source is obtained (an unlikely prospect), Next Level will face difficulty obtaining a "clean" opinion from its outside auditors.

### B. The Existence Of Immediate Irreparable Harm

Because the plaintiffs have failed to prove a probability of success on the mer-

its of their application, the court will not reach the issue of irreparable harm.

### C. The Balance Of Equities

Because plaintiffs have failed to prove a probability of success on the merits of their application, the court will not reach the issue of balancing equities.

### V.

For the foregoing reasons, plaintiffs' application for a preliminary injunction is **DENIED. IT IS SO ORDERED.**

---

**112.** *Id.* at 8.